# Supreme Court of Florida

———————

No. SC2022-1050

———————

**PLANNED PARENTHOOD OF SOUTHWEST AND CENTRAL FLORIDA, et al.,**
Petitioners,

**vs.**

**STATE OF FLORIDA, et al.,**
Respondents.

———————

No. SC2022-1127

———————

**PLANNED PARENTHOOD OF SOUTHWEST AND CENTRAL FLORIDA, et al.,**
Petitioners,

**vs.**

**STATE OF FLORIDA, et al.,**
Respondents.

April 1, 2024

GROSSHANS, J.

The Florida Constitution guarantees "the right to be let alone and free from governmental intrusion into . . . private life."  Art. I,

§ 23, Fla. Const.  In this case, we are asked to determine if there is a conflict between the rights secured by this provision and a recently amended statute that shortens the window of time in which a physician may perform an abortion.  *See* ch. 2022-69, § 4, Laws of Fla. (codified at section 390.0111(1), Florida Statutes (2022)).

The parties have presented thoughtful arguments as to the scope of this provision, which has traditionally been referred to as the "Privacy Clause."  Those legal arguments on the Privacy Clause's meaning are, in our view, distinct from the serious moral, ethical, and policy issues that are implicated in the subject matter of this case.  Our analysis focuses on the Privacy Clause's text, its context, and the historical evidence surrounding its adoption.  After considering each of these sources and consistent with longstanding principles of judicial deference to legislative enactments, we conclude there is no basis under the Privacy Clause to invalidate the statute.  In doing so, we recede from our prior decisions in which—relying on reasoning the U.S. Supreme Court has rejected— we held that the Privacy Clause guaranteed the right to receive an abortion through the end of the second trimester.  *See generally In re T.W.*, 551 So. 2d 1186 (Fla. 1989); *N. Fla. Women's Health &*

*Counseling Servs., Inc. v. State*, 866 So. 2d 612 (Fla. 2003);

*Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243 (Fla. 2017).

For this reason, petitioners are not entitled to the temporary injunction granted by the trial court, and we approve the outcome reached by the First District Court of Appeal below.[1]

I

This case involves a constitutional challenge to an amended Florida statute prohibiting abortions "if the physician determines the gestational age of the fetus is more than 15 weeks." § 390.0111(1), Fla. Stat. (2022); ch. 2022-69, § 8, Laws of Fla. (providing effective date of July 1, 2022). This prohibition does not apply if any of the following occurs:

> (a) Two physicians certify in writing that, in reasonable medical judgment, the termination of the pregnancy is necessary to save the pregnant woman's life or avert a serious risk of substantial and irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition.
>
> (b) The physician certifies in writing that, in reasonable medical judgment, there is a medical necessity for legitimate emergency medical procedures for termination of the pregnancy to save the pregnant woman's life or avert a serious risk of imminent substantial and

---

1. We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const. (express-and-direct conflict).

irreversible physical impairment of a major bodily function of the pregnant woman other than a psychological condition, and another physician is not available for consultation.

(c) The fetus has not achieved viability under s. 390.01112 and two physicians certify in writing that, in reasonable medical judgment, the fetus has a fatal fetal abnormality.

§ 390.0111(1)(a)-(c).  Prior to this change, the statute had restricted only late-term abortions.[2]

After this new law took effect, seven abortion clinics and one medical doctor (collectively Planned Parenthood)[3] sued the State and others.  Planned Parenthood alleged that the statute violated the Privacy Clause, which was added to the Florida Constitution in 1980.  Located within the Declaration of Rights, the clause provides in full:

---

2.  Specifically, the statute said, "No termination of pregnancy shall be performed on any human being in the *third trimester* of pregnancy unless one of [two] conditions is met."  § 390.0111(1), Fla. Stat. (2021) (emphasis added).

3.  The eight plaintiffs are Planned Parenthood of Southwest and Central Florida; Planned Parenthood of South, East, and North Florida; Gainesville Woman Care, LLC; A Woman's Choice of Jacksonville, Inc.; Indian Rocks Woman's Center, Inc.; St. Petersburg Woman's Health Center, Inc.; Tampa Woman's Health Center, Inc.; and Dr. Shelly Hsiao-Ying Tien.

SECTION 23. Right of privacy.—Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

With the complaint, Planned Parenthood filed a motion for temporary injunction, asking the trial court to block enforcement of the statute until it could rule on the merits of the constitutional challenge. In part, Planned Parenthood claimed that it was substantially likely to prevail in the lawsuit because it could demonstrate that the statute violates the Privacy Clause. In addition, Planned Parenthood argued that pregnant Floridians would be irreparably harmed absent a temporary injunction because the statute "would prohibit [them] from obtaining essential medical care and force them to remain pregnant and continue enduring the risks of pregnancy against their will." The statute, Planned Parenthood said, would also cause irreparable harm to itself and its staff by subjecting them to potential punitive consequences and interfering with the doctor-patient relationship.

The State opposed Planned Parenthood's request for a temporary injunction. It argued that Planned Parenthood lacked

standing to assert the privacy rights of its patients and, on the merits, could not establish any of the four requirements for a temporary injunction, let alone all four.[4]

After the State submitted its response, the U.S. Supreme Court issued a landmark decision on abortion in a case involving a Mississippi statute. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). In that decision, the Court ruled that the federal constitution does not guarantee a right to abortion. *Id.* at 231, 235-63, 292, 295. Based on this holding, the Court overturned *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992)—cases which had recognized a broad right to abortion under federal law. *Dobbs*, 597 U.S. at 292, 302 (expressly overruling *Roe* and *Casey*). In overruling those decisions, *Dobbs* "returned to the people and their elected representatives" "the authority to regulate abortion." *Id.* at 292.

---

4. Under Florida law, a party seeking a temporary injunction must prove four things: "(1) a substantial likelihood of success on the merits, (2) the unavailability of an adequate remedy at law, (3) irreparable harm absent entry of an injunction, and (4) that the injunction would serve the public interest." *Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1110 (Fla. 2021).

Several days after *Dobbs* issued, the trial court in this case held an evidentiary hearing on Planned Parenthood's motion for temporary injunction. Planned Parenthood called one witness and offered several exhibits. The State also presented witness testimony and documentary evidence.

Deeming Planned Parenthood's evidence persuasive, the trial court entered a temporary injunction. It found that Planned Parenthood had third-party standing and satisfied all four temporary-injunction elements. In finding a likelihood of success on the merits, the court relied on our abortion jurisprudence. *See generally T.W.*, 551 So. 2d at 1191-94 (Privacy Clause encompasses abortion); *N. Fla. Women's Health*, 866 So. 2d at 639 (reaffirming *T.W.*); *Gainesville Woman Care*, 210 So. 3d at 1246, 1253-55 (relying on *T.W.*). The court concluded that the statute was subject to strict scrutiny under that case law and determined that it either did not serve compelling interests or, in the alternative, was not the least restrictive means of achieving those interests. For the harm factor, the court ruled that both Planned Parenthood and its patients would suffer sufficient harm to support the requested relief. Rounding out its analysis, the court found no

adequate remedy at law and that an injunction would serve the public interests.

The State appealed to the First District, triggering an automatic stay of the temporary injunction.[5] Planned Parenthood asked the trial court and later the district court to vacate the automatic stay. Both courts, however, denied relief. *State v. Planned Parenthood of Sw. & Cent. Fla.*, 342 So. 3d 863, 865-66 (Fla. 1st DCA 2022). As relevant here, in denying Planned Parenthood's motion to vacate, a divided panel of the First District held that Planned Parenthood could not establish irreparable harm as a result of the stay. *Id.* at 868-69. A few weeks later, the district court relied on essentially that same reasoning in reversing the temporary injunction—again, one judge dissented. *State v. Planned Parenthood of Sw. & Cent. Fla.*, 344 So. 3d 637, 638 (Fla. 1st DCA 2022) ("[T]he non-final order granting the temporary injunction is reversed as [Planned Parenthood] could not assert irreparable harm on behalf of persons not appearing below."); *id.* (Kelsey, J., dissenting).

---

5. Fla. R. App. P. 9.310(b)(2) (automatic-stay provision triggered by filing of timely notice of appeal in certain situations).

Following these adverse rulings, Planned Parenthood asked us to review the First District's decisions, arguing that they conflict with our precedent. Accepting this jurisdictional argument, we granted review.

## II

Planned Parenthood asks that we quash the district court's decisions and reinstate the temporary injunction. Relying on our precedent, it argues that the right to an abortion is secured by our constitution's Privacy Clause. The State disputes Planned Parenthood's interpretation of the provision's text and asks us to reconsider our Privacy Clause jurisprudence or, at the very least, the abortion-related decisions.[6] It argues that *T.W.*—our first case recognizing a right to abortion under the Privacy Clause—is flawed

---

6. In its brief, the State argues that Planned Parenthood lacks standing to challenge the new law. However, at oral argument, the Solicitor General urged us to decide this case on the merits. Oral Arg. at 50:52-51:06 ("We do think that the Court can assume for the sake of argument that the Plaintiffs have standing here and instead reach the merits. . . . That, I think, is what the Court should do."). We view these statements as an abandonment of the State's standing argument. Thus, we proceed directly to the merits without passing upon any theory of standing articulated by the parties.

in numerous respects, including that it failed to meaningfully consider the actual text of the provision at issue, failed to consider the history of the provision, and failed to give deference to the statute challenged in that case. Mindful of these fundamental concerns, we agree that our holding in *T.W.* should be re-examined.[7]

In *T.W.*, this Court assessed a Privacy Clause challenge to a law that required unmarried minors to obtain parental consent or a substitute for consent to have an abortion. We held the challenged law to be incompatible with the protections afforded by the Privacy Clause, concluding that the right to abortion was *embodied* within the provision. *T.W.*, 551 So. 2d at 1188, 1192-96; *id. at* 1197, 1201

---

7. As our discussion will show, we also emphasize the uniqueness of the competing interests implicated in abortion and the fact that the Supreme Court repudiated *Roe* and its underlying understanding of privacy. Because these factors relate to *T.W.* in a particularized way, we do not take up the State's invitation now to revisit the question of whether the Privacy Clause protects only "informational privacy" interests. Our jurisprudence before and after *T.W.* has understood the Privacy Clause to encompass certain decisional or autonomy rights, and today we do not revisit our precedents outside the abortion context.

(Ehrlich, C.J., concurring specially).[8] In the majority opinion, we discussed *Roe v. Wade* at length and ultimately adopted its definition of privacy along with its trimester and viability rules. *See id.* at 1190-94. Integral to the majority's analysis, *T.W.* emphasized recent Florida cases (primarily from the district courts) equating privacy with the right of personal decision-making in the specific context of refusing unwanted medical treatment. *Id.* at 1192. We also relied on *Winfield v. Division of Pari-Mutuel Wagering*, 477 So. 2d 544 (Fla. 1985)—a case involving privacy in financial institution records—to conclude that the provision "embraces more privacy interests" and "extends more protection to the individual in those interests, than does the federal Constitution." *T.W.*, 551 So. 2d at 1192.

Building on that, this Court made the following broad pronouncement:

---

8. Three justices, however, concluded that the challenged statute could be given a constitutional construction, though they accepted or assumed that the Privacy Clause conferred a right to abortion. *T.W.*, 551 So. 2d at 1201-02 (Overton, J., concurring in part and dissenting in part); *id.* at 1202-04 (Grimes, J., concurring in part and dissenting in part); *id.* at 1204-05 (McDonald, J., dissenting).

Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy. We can conceive of few more personal or private decisions concerning one's body that one can make in the course of a lifetime, except perhaps the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment.

> Of all decisions a person makes about his or her body, the most profound and intimate relate to two sets of ultimate questions: first, whether, when, and how one's body is to become the vehicle for another human being's creation; second, when and how—this time there is no question of "whether"—one's body is to terminate its organic life.

[Laurence H.] Tribe, *American Constitutional Law* 1337-38 (2d ed. 1988). The decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman. *See Roe*, 410 U.S. at 153. The Florida Constitution embodies the principle that "[f]ew decisions are more personal and intimate, more properly private, or more basic to individual dignity and autonomy, than a woman's decision . . . whether to end her pregnancy. A woman's right to make that choice freely is fundamental."

*T.W.*, 551 So. 2d at 1192-93 (second alteration in original) (some citations omitted).

This pronouncement was flawed in several respects. *T.W.* associated the language of the Privacy Clause with *Roe*'s understanding of privacy; but it did not justify how that concept of privacy aligned with our constitution's text—i.e., "the right to be let alone and free from government intrusion into private life." *T.W.*

also did not ask how Florida voters would have understood the text of the provision and how that understanding would be informed by Florida's long history of proscribing abortion. As a result of its analytical path, *T.W.* did not look to dictionaries, contextual clues, or historical sources bearing on the text's meaning. Instead, overlooking all these probative sources, it adopted *Roe*'s notions of privacy and its trimester framework as matters of Florida constitutional law.[9] Compounding these errors, the *T.W.* majority failed to apply longstanding principles of judicial deference to legislative enactments and failed to analyze whether the statute should be given the benefit of a presumption of constitutionality.

Since *Roe* featured prominently in *T.W.*, we think it fair to also point out that the *T.W.* majority did not examine or offer a reasoned response to the existing criticism of that decision or consider

---

9. In his dissent, Justice Labarga emphasizes "that *T.W.* was decided on state law grounds." Dissenting op. at 90. We agree that *T.W.* was not applying federal law to the challenged statute. However, *T.W.* relied heavily on *Roe* in interpreting the meaning of our constitution's Privacy Clause. Indeed, *T.W.* cited *Roe* over twenty times, it accepted *Roe*'s concept of privacy without analysis, and it enacted a viability-trimester system that closely paralleled *Roe*'s, without citing to any Florida precedent supporting that framework.

- 13 -

whether it was doctrinally coherent. This was a significant misstep because *Roe* did not provide a settled definition of privacy rights. Controversial from the moment it was released, "*Roe*'s constitutional analysis was far outside the bounds of any reasonable interpretation of the various constitutional provisions to which it vaguely pointed." *Dobbs*, 597 U.S. at 268. What's more, *Roe* "failed to ground its decision in text, history, or precedent." *Id.* at 270. This left even progressive legal scholars baffled at how such a right could be gleaned from the constitution's text. Akhil R. Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 778 (1999) ("As a precedent-follower, *Roe* simply stringcites a series of privacy cases involving marriage, procreation, contraception, bedroom reading, education, and other assorted topics, and then abruptly announces with no doctrinal analysis that this privacy right 'is broad enough to encompass' abortion. . . . But as the Court itself admits a few pages later [in the opinion], the existence of the living fetus makes the case at hand 'inherently different' . . . from every single one of these earlier-invoked cases. And as a precedent-setter, the Court creates an elaborate trimester framework that has struck many critics as visibly (indeed, nakedly) . . . more legislative than

judicial." (footnotes omitted)); *see also* Laurence H. Tribe, *Foreword: Toward a Model of Roles in the Due Process of Life and Law*, 87 Harv. L. Rev. 1, 4 (1973) (noting that "[o]ne reads the Court's explanation [of the viability line] several times before becoming convinced that nothing has inadvertently been omitted").

Indeed, just three years after *T.W.* (and well before *Dobbs*), the U.S. Supreme Court abandoned *Roe*'s position that the right to abortion was grounded in any sort of privacy right. *See Casey*, 505 U.S. at 846 (joint opinion) ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment."); *cf. Dobbs*, 597 U.S. at 279 ("The Court [in *Casey*] abandoned any reliance on a privacy right and instead grounded the abortion right entirely on the Fourteenth Amendment's Due Process Clause."). This demonstrates the tenuous connection between "privacy" and abortion—an issue that, unlike other privacy matters, directly implicates the interests of both developing human life and the pregnant woman.

In light of *T.W.*'s analytical deficiencies and subsequent U.S. Supreme Court decisions rejecting the *Roe* framework on which

*T.W.*'s reasoning depended, our assessment of the challenged statute requires us to examine the Privacy Clause and, for the first time in the abortion context, consider the original public meaning of the text as it was understood by Florida voters in 1980.[10]

### III

### A

We begin by recognizing the standard that governs our review. Because this case requires us to review both "the constitutionality of a statute and the interpretation of a provision of the Florida Constitution," our review is de novo. *Lewis v. Leon Cnty.*, 73 So. 3d 151, 153 (Fla. 2011) (citing *Crist v. Fla. Ass'n of Crim. Def. Laws., Inc.*, 978 So. 2d 134, 139 (Fla. 2008)); *see also Florigrown, LLC*, 317 So. 3d at 1110.

We have long recognized that "statutes come clothed with a presumption of constitutionality and must be construed whenever possible to effect a constitutional outcome." *Lewis*, 73 So. 3d at

---

10. We decided two other significant cases involving abortion after *T.W.*, but in those cases, we did not provide additional doctrinal justifications for *T.W.*'s adoption of *Roe*'s privacy framework.

153 (citing *Fla. Dep't of Revenue v. City of Gainesville*, 918 So. 2d 250, 256 (Fla. 2005)).  Indeed, nearly a century ago, we said:

> (1) On its face every act of the Legislature is presumed to be constitutional; (2) every doubt as to its constitutionality must be resolved in its favor; [and] (3) if the act admits of two interpretations, one of which would lead to its constitutionality and the other to its unconstitutionality, the former rather than the latter must be adopted . . . .

*Gray v. Cent. Fla. Lumber Co.*, 140 So. 320, 323 (Fla. 1932); *see also Savage v. Bd. of Pub. Instruction for Hillsborough Cnty.*, 133 So. 341, 344 (Fla. 1931); *Chatlos v. Overstreet*, 124 So. 2d 1, 2 (Fla. 1960); *In re Caldwell's Estate*, 247 So. 2d 1, 3 (Fla. 1971); *Franklin v. State*, 887 So. 2d 1063, 1073 (Fla. 2004); *Florigrown, LLC*, 317 So. 3d at 1111; *Statler v. State*, 349 So. 3d 873, 884 (Fla. 2022).  And to overcome the presumption of constitutionality, "the invalidity must appear beyond reasonable doubt."  *Franklin*, 887 So. 2d at 1073 (quoting *State ex rel. Flink v. Canova*, 94 So. 2d 181, 184 (Fla. 1957)); *see also Waybright v. Duval Cnty.*, 196 So. 430, 432 (Fla. 1940) ("[W]e will . . . determine if, beyond a reasonable doubt, violence was done [to] any provisions of the organic law in the passage of the challenged act, and in doing so will not deal with the

merits of the measure, that being the exclusive concern of the Legislature.").

B

Our approach to interpreting the constitution reflects a commitment to the supremacy-of-text principle, "recognizing that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *Coates v. R.J. Reynolds Tobacco Co.*, 365 So. 3d 353, 354 (Fla. 2023) (alteration in original) (quoting *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021)) (interpreting statutory text); *see also Advisory Op. to Governor re Implementation of Amend. 4, The Voting Restoration Amend.* (*Amendment 4*), 288 So. 3d 1070, 1081 (Fla. 2020) (interpreting constitutional text). The goal of this approach is to ascertain the original, public meaning of a constitutional provision—in other words, the meaning as understood by its ratifiers at the time of its adoption. *See City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 183 (Fla. 2023) ("[W]e give the words of the constitution their plain, usual, ordinary, and commonly accepted meanings at the time they were written."). In construing the meaning of a constitutional provision, we do not

- 18 -

seek the original intent of the voters or the framers. Instead, we ask how the public would have understood the meaning of the text in its full context when the voters ratified it. *See Amendment 4*, 288 So. 3d at 1081-82.

To answer this question of public meaning, we consider the text, *see Alachua Cnty. v. Watson*, 333 So. 3d 162, 169-70 (Fla. 2022), contextual clues, *see id.*, dictionaries, *see Somers v. United States*, 355 So. 3d 887, 891 (Fla. 2022), canons of construction, *see Conage v. United States*, 346 So. 3d 594, 598-99 (Fla. 2022), and historical sources, including evidence related to public discussion, *see Tomlinson v. State*, 369 So. 3d 1142, 1147-51 (Fla. 2023); *Dist. of Columbia v. Heller*, 554 U.S. 570, 614 (2008).

IV

With these background principles fixed, we now focus our attention on the Privacy Clause itself. Article I, section 23 is entitled: "Right of privacy." Our constitution, though, tells us that in construing the meaning of constitutional text, we are not to use titles and subtitles. *See* art. X, § 12(h), Fla. Const. Accordingly, we look at the operative text, which guarantees the right "to be let

alone and free from governmental intrusion into the person's private life."  Art. I, § 23.

As is apparent at first glance, the provision does not explicitly reference abortion at all.  Thus, if Planned Parenthood is to prevail, we must find that the public would have understood the principle embodied in the operative text to encompass abortion, even though the clause itself says nothing about it.

To this end, the parties have marshaled era-appropriate dictionary definitions of key terms in the Privacy Clause.  Based on the dictionaries we consulted, we know that in 1980 the right to be "let alone" could be defined as the right to be left "in solitude," free from outside "interfer[ence]" or "attention."  *See Let Alone, Oxford English Dictionary* 213 (1st ed. 1933) (reprinted in 1978).  And the latter phrase—"free from governmental intrusion" into "private life"—can convey a similar meaning.  "Intrusion" meant "[i]llegal entry upon or appropriation."  *Intrusion, American Heritage Dictionary of the English Language* 688 (1st ed. 1969); *see also Intrusion, American Heritage Dictionary* 674 (2d Coll. ed. 1982) (same); *Intrude, American Heritage Dictionary of the English Language* 687 (1st ed. 1969) ("To interpose (oneself or something)

without invitation, fitness, or leave."); *Intrude, American Heritage Dictionary* 674 (2d Coll. ed. 1982) (similar). And the word "private" carried the idea of being "[s]ecluded from the sight, presence, or intrusion of others," the chief example being "a private bathroom." *Private, American Heritage Dictionary of the English Language* 1042 (1st ed. 1969); *Private, American Heritage Dictionary* 986 (2d Coll. ed. 1982) (same).

These accepted definitions do not seem to us to be natural ways of describing the abortion procedures of 1980. The decision to have an abortion may have been made in solitude, but the procedure itself included medical intervention and required both the presence and intrusion of others. *See, e.g., Roe*, 410 U.S. at 172 (Rehnquist, J., dissenting) ("A transaction resulting in an operation such as [abortion] is not 'private' in the ordinary usage of that word."); *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 792 (1986) (White, J., dissenting) (noting that even the *Roe* majority recognized a "pregnant woman cannot be isolated in her privacy" because "the termination of a

pregnancy typically involves the destruction of another entity: the fetus" (quoting *Roe*, 410 U.S. at 159)).[11]

Next, we see if contextual clues could offer guidance. Looking at the complete text of the provision allows us to consider the physical and logical relation of its parts, as they might have been viewed by a voter. *See Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022).

---

11. The dissent cites *Griswold v. Connecticut*, 381 U.S. 479 (1965) (invalidating on privacy grounds a state law criminalizing the use of contraception in the marital context), to support the assertion that the involvement of others does not prevent an activity or procedure from being a private matter. Dissenting op. at 67-68 (stressing that the law at issue in *Griswold* "operate[d] directly on an intimate relation of husband and wife *and their physician's role in one aspect of that relation*" (quoting *Griswold*, 381 U.S. at 482)). But the Court in *Griswold* "only invalidated the section of the state law which prohibited the *use* of contraception, rather than outlawing the manufacture, distribution, or sale of contraceptives." Alyson M. Cox & O. Carter Snead, *"Grievously and Egregiously Wrong": American Abortion Jurisprudence*, 26 Tex. Rev. L. & Pol. 1, 16-17 (2022). Indeed, as we noted above, *Roe* itself acknowledged that abortion was "inherently different" from the situations involved in cases like *Griswold*. *Roe*, 410 U.S. at 159. Thus, we do not share the dissent's concern "that parties will rely on the majority's reasoning—that the involvement of 'others' in an abortion procedure defeats privacy—in attempts to undermine the broad privacy protections that are extended in the medical context." Dissenting op. at 68.

The first sentence sets forth the protected right, i.e., "to be let alone and free from governmental intrusion into . . . private life." The second sentence then provides that "[t]his section shall not be construed to limit the public's right of access to public records and meetings as provided by law." Art. I, § 23. By its terms, this latter sentence covers "public records and meetings." That phrase—which relates only to accessing public information—does not implicate or apply to the subject of abortion. We do not give great weight to this observation, but we note it here to emphasize that contextual clues do not lend support to a claim that voters clearly understood abortion to be part and parcel of the rights recognized in the Privacy Clause.

V

Dictionary definitions and immediate context, although informative, do not provide a full picture of the text's meaning. We also consider the historical background of the phrases contained within the operative text. *See Tomlinson,* 369 So. 3d at 1146 ("[W]hen (as often happens) a word had more than one accepted meaning at that time, we decide which one is the law by looking to the context in which it appears, and what history tells us about

- 23 -

how it got there."); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012) ("[C]ontext embraces not just textual purpose but also . . . a word's historical associations acquired from recurrent patterns of past usage . . . ."); *see also Heller*, 554 U.S. at 605 (noting the critical importance in constitutional interpretation of examining "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (relying on historical sources in determining constitutional text's meaning); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-27 (2022) (historical sources integral to Court's holding).

## A

Before examining the Privacy Clause's specific history and public debate, we explore the settled use of the "right to be let alone" in the context of Florida law, cognizant that technical meanings might bear upon the public understanding of the constitutional text.[12]

---

12. In construing constitutional provisions that have an acquired meaning, "[w]e cannot understand these provisions unless

The phrase "to be let alone" carries with it a rich legal tradition. In *Cason v. Baskin*, we discussed the common-law right to privacy and explained that in substance it was "the right to be let alone, the right to live in a community without being held up to the public gaze if you don't want to be held up to the public gaze." 20 So. 2d 243, 248 (Fla. 1944) (quoting Laurence H. Eldredge, *Modern Tort Problems* 77 (1941)).[13] This right "to be let alone," which was

_____

we understand their history; and when we find them expressed in technical words, and words of art, we must suppose these words to be employed in their technical sense." Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union* 93-94 (7th ed. 1903). Indeed, "[t]he technical sense in these cases is the sense *popularly understood*, because that is the sense fixed upon the words in legal and constitutional history where they have been employed for the protection of popular rights." *Id.* at 94 (emphasis added).

13. We recognize that this phrase "the right to be let alone" is likely sourced from the seminal 1890 law-review article, *The Right to Privacy*. Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890); *cf. Stall v. State*, 570 So. 2d 257, 265 (Fla. 1990) (Kogan, J., dissenting) (recognizing significance of this article). The authors of that article elaborated on the "right to be let alone" and free from "intrusion upon the domestic circle." Warren & Brandeis, *supra*, at 195-96 (borrowing label for this right from a tort treatise by Judge Thomas Cooley). The right, however, "had little to do with the autonomy of an individual to make decisions . . . free from government control." Jeffrey M. Shaman, *The Right of Privacy in State Constitutional Law*, 37 Rutgers L.J. 971, 990 (2006). It described a "different sort of privacy"—one

- 25 -

often used interchangeably with the "right to privacy," was a prominent feature in Florida tort law. *See, e.g., Battaglia v. Adams*, 164 So. 2d 195, 197 (Fla. 1964) ("An unauthorized use of a person's name in this respect is recognized as a violation of his right of privacy."); *Jacova v. S. Radio & Television Co.*, 83 So. 2d 34, 36 (Fla. 1955) (reiterating that Florida recognized a common-law claim for invasion of privacy and noting that "[when] one, whether willingly or not, becomes an actor in an occurrence of public or general interest," "he emerges from his seclusion, and it is not an invasion of his 'right of privacy' to publish his photograph with an account of such occurrence" (quoting *Metter v. L.A. Exam'r*, 95 P.2d 491, 494 (Cal. Ct. App. 1939))); *Harms v. Mia. Daily News, Inc.*, 127 So. 2d 715, 717 (Fla. 3d DCA 1961) (noting in the tort context that "[t]he

---

"directed to keeping personal information from being exposed to the public, rather than to keeping decision-making within the control of an individual." *Id.* To Warren and Brandeis, the "right to be let alone" and free from "intrusion" safe-guarded against the publication of private facts. Warren & Brandeis, *supra,* at 195-96, 207-12.

right of privacy is defined as the right of an individual to be let alone and to live a life free from unwarranted publicity").[14]

Significantly, throughout the decades in which the "right to be let alone" was developed and applied in Florida, two distinct propositions were true in the law and harmonious: first, the right "to be let alone" existed and had a discernable and enforceable meaning; and second, the Legislature had the authority to comprehensively regulate abortion before and after viability. Indeed, from at least 1868 to 1972, abortion was for the most part prohibited in our state.[15] And although litigants, prior to the

---

14. Florida law in this respect appears consistent with that of other jurisdictions. *See* W.E. Shipley, Annotation, *Right of Privacy*, 14 A.L.R.2d 750 (1950) (noting acts of intrusion into one's private affairs may also constitute violations of the right of privacy, such as eavesdropping, examination of private records or papers, or publications of personal material identified with the complainant as would using the complainant's name or likeness in almost any form of distributive publication).

15. *See* ch. 1637, subc. 3, § 11, subc. 8, § 9, Laws of Fla. (1868) (outlawing most abortions); Rev. St. 1892, §§ 2387, 2618 (same); §§ 782.10, 797.01, Fla. Stat. (1941) (repealed 1972) (same); §§ 782.10, 797.01, Fla. Stat. (1971) (repealed 1972) (same). In 1972, this Court determined that the abortion statute in effect at that time was unconstitutionally vague. *State v. Barquet*, 262 So. 2d 431, 438 (Fla. 1972). Immediately following that decision, the Legislature passed a more specific law, still banning abortion at all times during pregnancy except in certain limited circumstances.

adoption of the Privacy Clause, sought to curtail government action by arguing they had the "right to be let alone," we are not aware of litigants invoking that particular right to challenge abortion restrictions in Florida.

We also stress that this "right to be let alone" was modified by a limiting principle: the right did not permit an individual to inflict harm on herself or others. *See State v. Eitel*, 227 So. 2d 489, 491 (Fla. 1969) (rejecting a challenge to helmet laws based on a right "to be let alone," stressing that "no person is an entirely isolated being" and that "it is impossible for a person to do anything seriously or permanently hurtful to himself, without mischief reaching at least to his near connections, and often far beyond them") (cleaned up). Indeed, our Privacy Clause jurisprudence outside the abortion context recognizes that the right does not authorize harm to third parties. *See, e.g., Beagle v. Beagle*, 678 So. 2d 1271, 1276 (Fla. 1996) (parents' privacy right to raise their children yields to need to protect children from harm). Because the "right to be let alone" was limited in this way, it is not surprising that when litigants

---

Ch. 72-196, § 2, Laws of Fla. (codified at section 458.22 of the Florida Statutes (Supp. 1972)) (repealed 1976).

challenged the 1972 abortion statute in this Court, they did not do so based on the "right to be let alone." Instead, they argued a right to privacy grounded in substantive due process under the Fourteenth Amendment to the United States Constitution. *See Barquet*, 262 So. 2d at 434.

B

We also acknowledge that the public understanding of the term "privacy" was, to some extent, informed by the U.S. Supreme Court's 1973 decision in *Roe v. Wade*. Following that decision, the phrase "right to privacy" gained new connotations that, for the first time, included the choice to have an abortion. *See Roe*, 410 U.S. at 154 ("We, therefore, conclude that the right of personal privacy includes the abortion decision . . . ."). In Planned Parenthood's view, this aspect of federal privacy jurisprudence should control our analysis here. Specifically, Planned Parenthood argues that Florida voters would have internalized *Roe*'s definition of privacy when they voted for the privacy amendment. Indeed, Planned Parenthood has repeatedly asserted that the public understanding of this privacy definition was so engrained by 1980 that even without a specific mention of the term abortion, the Privacy Clause unequivocally

included such a right by implication. Agreeing with this argument, the dissent cites case law, newspaper articles, a news clip, and more to support the contention that Americans, and Floridians in particular, would have naturally understood privacy to encompass abortion.[16]

Though this argument has some force, we cannot agree with Planned Parenthood or the dissent that the backdrop of *Roe* conclusively establishes how a voter would have understood the provision. In *Roe,* the Supreme Court did not consider language comparable to the operative text of Florida's Privacy Clause—that is, the "right to be let alone." That phrase is found only once in *Roe,* and that single mention is in Justice Stewart's concurrence quoting *Katz v. United States,* 389 U.S. 347 (1967), in support of the proposition that there is no federal right to privacy. *Roe,* 410 U.S.

---

16. This evidence consists primarily of media coverage surrounding the *Roe* decision and subsequent evidence that discussed the abortion debate and associated a right of privacy with abortion. We accept that *Roe* had some bearing on the public's understanding of privacy rights in 1980. But, unlike the dissent, we do not find that it is dispositive. We are unwilling to disregard other probative evidence of public meaning, much of which is focused specifically on the amendment itself. The dissent, in our view, gives little attention to such evidence.

at 167 n.2 (Stewart, J., concurring). So, while the *Roe* majority may have deemed abortion to be part of a "right to privacy," it would require an analytical leap to say that the public would have instinctively associated "the right to be let alone and free from governmental interference into one's private life" with abortion. *E.g.*, Louis Henkin, *Privacy and Autonomy*, 74 Colum. L. Rev. 1410, 1424 (1974) (decisional autonomy "is not at all what most people mean by privacy," which instead concerns "my freedom from official intrusion into my home, my person, my papers, my telephone"). This point is reinforced by the fact that the specific phrase used in the Privacy Clause had a consistent meaning in Florida law and had never once been interpreted to cover abortion rights.

And as a final point here, we reiterate that *Roe* did not settle the scope of privacy rights as Planned Parenthood insists. As we discussed earlier, *Roe*'s privacy-based reasoning was questioned soon after the opinion issued and was eventually rejected in a decision that completely detached abortion rights from the concept of privacy. *See Casey*, 505 U.S. at 846 (joint opinion). Thus, even if it is possible that voters would have understood the Privacy Clause to protect certain individual autonomy interests, it is by no means

clear that those interests would have included the controversial subject of abortion, which uniquely involves the interests of prenatal life. Consequently, while *Roe* is relevant to our analysis of public meaning, it is not dispositive.

Having considered dictionary definitions, context, and technical meanings that could have informed the original public meaning, we now turn to a critical piece of our historical analysis where we answer the following relevant questions: How did this provision make its way to the ballot, what was the focus of the debate surrounding its adoption, and how were the issues framed for the voters?

C

The origin of our Privacy Clause traces back to the work of a constitution revision commission in the late 1970s. As part of its work, the commission held public meetings throughout Florida and listened to the public's views and concerns. *See* Daniel R. Gordon, *Upside Down Intentions: Weakening the State Constitutional Right to Privacy, a Florida Story of Intrigue and a Lack of Historical Integrity*, 71 Temp. L. Rev. 579, 588 (1998); Transcript of Fla. C.R.C. proceedings at D:003272-73 (Jan. 9, 1978) (discussion of

committee's work regarding privacy proposal). Eventually, the commission agreed upon the following language:

> Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein.

Patricia A. Dore, *Of Rights Lost and Gained*, 6 Fla. St. U. L. Rev. 609, 650 n.248 (1978) (quoting Fla. C.R.C., Rev. Fla. Const. art. I, § 23 (May 11, 1978)).

That proposed amendment, along with roughly 80 others, was submitted to the public as a package deal in the 1978 election. Gordon, *supra*, at 588. This package, in addition to containing the privacy proposal, also included amendments ensuring access to (1) public records, (2) meetings of non-judicial public bodies, (3) judicial hearings and records, and (4) proceedings and records of the judicial nominating commissions. Gerald B. Cope, Jr., *To Be Let Alone: Florida's Proposed Right of Privacy*, 6 Fla. St. U. L. Rev. 671, 675-77 (1978). Of note, proposals specifically addressing state abortion rights were rejected by the commissioners and never made it to the ballot. *See* Fla. Const. Revision Comm'n, *Summary of Proposed Revisions to the Florida Constitution* 1-2 (Sept. 27, 1977) (available in the Florida State University College of Law Research

Center); *cf.* Mary Ann Lindley, *A New Constitution Takes Shape*,

Palm Beach Post-Times, Apr. 9, 1978, at D1.

For our purposes, though, we focus on statements made by

commissioners in describing the reason or need for the proposal.[17]

On this subject, Justice Overton said:

> [W]ho, ten years ago, really understood that personal and
> financial data on a substantial part of our population
> could be collected by government or business and held
> for easy distribution by computer operated information
> systems?  There is a public concern about how personal
> information concerning an individual citizen is used,
> whether it be collected by government or by business.
> The subject of individual privacy and privacy law is in a
> developing stage. . . .  It is a new problem that should
> probably be addressed.

Transcript of Fla. C.R.C. proceedings D:000020-21 (July 6, 1977).

---

17.  *See McDonald v. City of Chicago*, 561 U.S. 742, 828-29 (2010) (Thomas, J., concurring in part and concurring in the judgment) ("When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted.  Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase.  They can further assist to the extent there is evidence that these statements were disseminated to the public.  In other words, this evidence is useful not because it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.").

Justice Overton was not alone in this respect. Commissioner Jon Moyle (sponsor of the privacy proposal) spoke of government surveillance, technological advances, and society's dependence on such technology—characterizing them as threats to an individual's privacy. Transcript of Fla. C.R.C. proceedings at D:003273, 3276-78 (Jan. 9, 1978). He also noted that records about private life were becoming more common. *Id.* at D:003277-81. According to him, states were "very much involved in the business of keeping records about their residents." *Id.* at D:003276. But the states, in his view, had not done "their part" in protecting such records. *Id.* at D:003277. In line with Commissioner Moyle's sentiments, Commissioners Lew Brantley and Dexter Douglass both noted specific government-surveillance efforts as sources of privacy concerns. *Id.* at D:003325 (remarks of Lew Brantley); *id.* at D:003336 (remarks of Dexter Douglass).

This historical survey is illustrative of the commission's focus in terms of privacy. Various commissioners publicly expressed concern for informational privacy. However, as best as we can tell from their statements, that pressing concern did not extend to abortion.

- 35 -

The proposals failed, and less than two years later, we held that there was no state constitutional right of privacy that would prevent public disclosure of confidential papers prepared by a consultant for an electric authority. *Shevin v. Byron, Harless, Schaffer, Reid & Assocs., Inc.*, 379 So. 2d 633, 639 (Fla. 1980); *cf. Laird v. State*, 342 So. 2d 962, 963 (Fla. 1977) (no constitutional right of privacy to smoke marijuana in confines of home).

Months after *Shevin* was decided, the Legislature revived the idea of a privacy clause and ultimately agreed on a proposal that said:

> Every natural person has the right to be let alone and free from governmental intrusion into [the person's] private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

Editorial, *Guaranteeing Our Privacy*, Boca Raton News, Oct. 29, 1980, at 6A (setting forth language to appear on 1980 ballot); Patrick McMahon, *State Constitutional Amendments*, St. Petersburg Times, Oct. 30, 1980, at 22 (noting ballot title).

In overwhelming numbers, legislators from both political parties voted to approve it for placement on the ballot. Out of the

138 legislators who voted on it, only 6 did not support the proposal. *See* Lorraine Cichowski, *House Votes to Propose Guaranteeing Right to Privacy*, Fort Myers News-Press, May 7, 1980, at 8B; Jim Walker, *Senators Clash over Privacy Amendment*, Tampa Tribune, May 15, 1980, at 6-A. Of additional note, during the floor debate, there was virtually no discussion of abortion. And when abortion was brought up, the Senate sponsor assured other senators that the proposal would have no effect on that subject. Audio Tape: Proceedings of the Fla. S., Tape 2 at 17:40 (May 14, 1980) (available at Fla. Dep't of State, Fla. State Archives, Tallahassee, Fla., Series S1238, Box 57).

As best as we can tell, no commissioner or legislator ever claimed (at least publicly between 1977-80) that abortion was part of the rights guaranteed by the Privacy Clause.[18] *See, e.g.*, Gordon,

---

18. To the extent that Planned Parenthood relies on Representative Jon Mills's later statement in the 1990s that he subjectively hoped that the privacy proposal would cover abortion, such reliance is misplaced. *See Heller*, 554 U.S. at 577 (proper approach to interpretation does not consider hidden or secret meaning "that would not have been known to ordinary citizens in the founding generation"). Similarly, Planned Parenthood and one amicus misplace reliance on how voters handled two later proposed amendments—one in 2004 and the other in 2012. The understanding of voters over 20 years after the privacy amendment offers little value in determining what the voters in 1980 would have understood the privacy proposal to mean. Indeed, at oral

*supra,* at 590 n.148 ("Nowhere did revision commissioners in 1978 refer to abortion . . . ."). Indeed, Planned Parenthood does not claim otherwise.

D

Like the history of the privacy proposal, the public debate surrounding the amendment also did not focus on abortion. Once the privacy proposal was approved for placement on the ballot in 1980, the public engaged in significant and robust debate over whether that proposal should be approved.

Advocates for homosexual rights, proponents of legalized marijuana use, and various editorial boards advocated in favor of the amendment. Mary Hladky, *Commissioners Table Vote on State Privacy Amendment,* Fort Lauderdale News, Oct. 1, 1980, at 8B; Mary Lavers, *Privacy Amendment Advocated by Kunst,* Tampa Times, Oct. 23, 1980, at 10-A; Associated Press, *Privacy Amendment Caught in Swirl of Controversy,* Sentinel Star (Orlando), Oct. 24, 1980, at 2-C; Editorial, *Amendment 2—Vote Yes,*

---

argument, Planned Parenthood conceded as much. *See* Oral Arg. at 22:59-23:02 ("2012 isn't evidence of what [the privacy amendment] meant in 1980.").

Bradenton Herald, Nov. 1, 1980, at A-4; Craig Matsuda, *State Questions Are a Mix of Roads, Water, Privacy*, Miami Herald, Nov. 2, 1980, at 8E; *Amendments*, St. Petersburg Times, Nov. 1, 1980, at 12B. These groups presented sweeping views of what the amendment would accomplish. Some, for instance, claimed that the amendment would decriminalize marijuana as well as certain intimate sexual conduct occurring inside the confines of a home. Julius Karash, *Psychologist Stumps for Amendment*, News-Press Local, Oct. 3, 1980, at B1; Steve Piacente, *Gay Rights Activist Speaks for Privacy Act*, Tampa Tribune, Oct. 24, 1980, at 2-B.

Opponents of the measure included some political conservatives, various law enforcement officers, an association of prosecutors, and the then-serving governor. *Prosecutors Condemn Privacy Amendment*, Florida Today, Oct. 28, 1980, at 4B; *Attorneys' Group Fights Privacy Amendment*, Palm Beach Post, Oct. 28, 1980, at B26; *Amendments under Attack as Vote Nears*, Bradenton Herald, Oct. 29, 1980, at B-5; *Graham Hit on Privacy*, Florida Today, Oct. 29, 1980, at 6B; *Amendment Opposition by Graham Criticized*, Palm Beach Post, Oct. 29, 1980, at A11; *Lawyer Raps Constitution Revision Plan*, Fort Lauderdale News, Oct. 29, 1980, at 17A; Michael

Harrell, Advertisement, Fort Lauderdale News, Oct. 29, 1980, at 16A; *Amendments*, St. Petersburg Times, Nov. 1, 1980, at 12B. Some opponents expressed concern that the open-ended language would permit courts to expansively interpret the amendment. Sensing that growing concern, House sponsors of the privacy proposal weighed in on the public debate. Taking to the newspapers, they reassured the public that concerns about whether the amendment would accomplish sweeping policy changes were unfounded. For instance, sponsors said that the proposed amendment arose from concerns "about technological advances that could enable the government to compile extensive computer files on citizens." *Privacy Amendment Caught in Swirl of Controversy*, *supra*, at 2-C; *see also* Associated Press, *Privacy Measure Stirs Controversy*, Pensacola News-Journal, Nov. 2, 1980, at 14C. Indeed, one sponsor said that the proposal was "necessary to ward off a growing government whose curiosity about people's private lives also is increasing." R. Michael Anderson, *Amendment Guaranteeing Right to Privacy Debated*, Florida Times-Union Jacksonville Journal, Oct. 26, 1980, at B-1. That same sponsor characterized the proposal as "quite conservative," predicting that

"Florida judges wouldn't use it to overturn many existing laws." *Privacy Amendment Caught in Swirl of Controversy*, *supra*, at 2-C. And the other sponsor called expansive views of the proposed amendment "garbage." *See id.*

Of note, in looking at the extensive discussion surrounding the privacy amendment, little to nothing was said about abortion in print or in public comment. The debate—as framed to the public—overwhelmingly associated the Privacy Clause's terms with concerns related to government surveillance and disclosure of private information to the public.

Consistent with this observation, prolife and prochoice groups did not join in the fray. These groups are not politically bashful—not now, and not in 1980. If the public understanding of the privacy proposal was that it included a silent—but almost unfettered—right to abortion, we would expect such groups to have engaged in the robust public debate. But based on all sources brought to our attention, we simply see no evidence of that. *See* James W. Fox, Jr., *A Historical and Originalist Defense of Abortion in Florida*, 75 Rutgers U. L. Rev. 393, 443-44 (2023) (acknowledging that these groups were silent on this topic; but

discounting significance of such fact); *cf.* Oral Arg. at 13:02-13:39 (counsel for Planned Parenthood acknowledging that silence in the historical record).

The dissent downplays the significance of this scope-of-debate evidence. Dissenting op. at 86. Accepting the logic of a law review article, the dissent claims that "[a]bortion would only have been debated if its coverage within the right to privacy were in dispute or were not yet established in law." Dissenting op. at 86 (quoting Fox, *supra,* at 442-43). We, however, cannot agree with this speculation. A person's understanding of the amendment's purpose would certainly inform whether he or she supported the adoption of the amendment. And, critically, it would inform how that person would persuade others to adopt their position. The debate over the privacy amendment was vigorous, yet there is virtually no evidence that anyone publicly connected the privacy amendment proposal with abortion rights. And as referenced by the dissent, newspapers during this same period were still discussing the controversy surrounding abortion, so it was far from a settled issue. Dissenting op. at 81-82 (noting that "Florida newspapers" in 1980 "covered statements by pro-choice activists and by pro-life activists"

involving the abortion debate). We are unwilling to presume, as the dissent does, that abortion was so intertwined with the term "privacy" and so unquestionably accepted by society that its complete absence from the public debate surrounding this amendment should be expected.

In sum, the scope of the privacy-proposal debate, both in terms of topics and participants, underscores that the public would not have understood, or assumed, the language of the Privacy Clause to encompass abortion.

E

Finally, we consider two additional sources of historical evidence, both of which show a contemporaneous understanding that the Privacy Clause did not enshrine abortion rights in our constitution. The first is concurrent legislative action. There were several Florida statutes passed between 1978 and 1980 regulating or restricting access to abortion in substantial ways. *See* ch. 78-382, §§ 2, 4-10, Laws of Fla. (empowering Department of Health and Rehabilitative Services to create rules regulating abortion clinics; setting forth licensing requirement and framework; prohibiting abortion by unlicensed clinics); ch. 79-302, § 1, Laws of

Fla. (requiring parental consent for unmarried minors); ch. 80-208, § 1, Laws of Fla. (fetal remains to be disposed of in "sanitary and appropriate manner"; establishing crime for violations of this standard); ch. 80-413, § 1, Laws of Fla. (additional regulations on abortion clinics; imposing standard governing disposal of fetal remains); *cf.* Amicus Brief of Former State Representative John Grant at 25-28 (noting concurrent legislation on abortion—particularly the abortion law passed during the same session as the privacy proposal).  Based on this significant body of abortion regulation—some of which would be struck down as violative of *Roe*[19]—it seems unlikely to us that the Legislature in 1980 would put to the people a proposal crafted to imperil that recent work.

The second source of evidence is what legislators of the time expressed with respect to adding a right-to-life amendment to the U.S. Constitution.  *See* Fla. S. Comm. on HRS SM 737 (1978) Staff Analysis 1 (Fla. May 9, 1978) (available at Fla. Dep't of State, Fla. State Archives, Tallahassee, Fla.); Fla. H.R., H.M. 388, 11th Sess. (Fla. 1979) (available at Dep't of State, Fla. State Archives,

---

19.  *See, e.g., Fla. Women's Med. Clinic, Inc. v. Smith,* 536 F. Supp. 1048, 1059 (S.D. Fla. 1982).

Tallahassee, Fla.); Fla. S., S.M. 118, 11th Sess. (Fla. 1979) (available at Fla. Dep't of State, Fla. State Archives, Tallahassee, Fla.). Of significance here, twenty-seven legislators who voted for the privacy proposal had, within the prior two years, openly supported the adoption of a federal amendment to "protect unborn human[s]" in response to *Roe v. Wade. Compare* H.R. Journal, 12th Sess., at 318 (Fla. 1980), *with* H.R. Journal, 11th Sess., at 48 (Fla. 1979); *compare* S. Journal, 11th Sess., at 21 (Fla. 1979), *with* S. Journal, 12th Sess., at 313 (Fla. 1980). To us, it seems quite unlikely that so many legislators would have tried to remove abortion rights as a matter of federal constitutional law only to restrict legislative power on abortion just two years later by way of a state constitutional amendment.

### F

We pause to summarize the textual, contextual, and historical evidence we have discussed so far. The Privacy Clause of the Florida Constitution does not mention abortion or include a word or phrase that clearly incorporates it. Era-appropriate dictionary definitions and contextual clues suggest that abortion does not naturally fit within the rights at issue. Reliable historical sources,

like the technical meaning of the terms contained in the provision, the origin of the amendment, and the framing of the public debate, similarly do not support a conclusion that abortion should be read into the provision's text. *Roe* is also relevant to our analysis of the public meaning of the Privacy Clause. But speculation as to *Roe*'s effect on voter understanding does not overcome the combined force of the substantial evidence we have examined above. Thus, we cannot conclude that in 1980 a voter would have assumed the text encompassed a polarizing definition of privacy that included broad protections for abortion.

## VI

We have established the background legal principles that govern our review and analyzed the original public meaning of the Privacy Clause as it relates to the subject of abortion. Now, we must address how those considerations apply here—namely, can Planned Parenthood demonstrate conflict between the challenged statute and the constitutional protections secured by the Privacy Clause?

The statute we review prohibits abortions after 15 weeks of pregnancy, subject to certain exceptions. This statute "come[s]

clothed with a presumption of constitutionality and must be construed" if possible "to effect a constitutional outcome." *Crist*, 978 So. 2d at 139. To overcome this presumption, the challenger must establish invalidity (or conflict) "beyond reasonable doubt." *Id.* Based on our analysis finding no clear right to abortion embodied within the Privacy Clause, Planned Parenthood cannot overcome the presumption of constitutionality and is unable to demonstrate beyond a reasonable doubt that the 15-week ban is unconstitutional.[20]

This conclusion brings us into tension with our precedent, primarily *T.W.* in which we derived a right to abortion from the Privacy Clause's text and invalidated a statute on that basis. 551 So. 2d at 1188; *see also N. Fla. Women's Health*, 866 So. 2d at 639 (reaffirming *T.W.*); *Gainesville Woman Care*, 210 So. 3d at 1253-56,

---

20. Even if we gave significantly greater weight to *Roe*'s effect on the original public meaning of the Privacy Clause (as urged by the dissent) and gave less weight to the other meaningful sources of evidence discussed above, we would still be left without a definition of privacy and considerable ambiguity as to the breadth of the provision. In that instance, we would reach the same conclusion, because a statute is presumed constitutional unless shown to be invalid *beyond a reasonable doubt. Franklin*, 887 So. 2d at 1073. The dissent fails to address what effect, if any, this longstanding principle of law should have here.

1260 (relying on *T.W.*). In deciding how to resolve that tension, we again emphasize that *T.W.* failed to acknowledge the longstanding principle that statutes are presumed to be constitutional. This error led the Court to read additional rights into the constitution based on *Roe*'s dubious and immediately contested reasoning, rather than evaluate what the text of the provision actually said or what the people of Florida understood those words to mean. The decision to extend the protections of the Privacy Clause beyond what the text could reasonably bear was not ours to make. As a result, we removed substantial authority from the people's elected representatives to regulate abortion—a profoundly unique and complicated issue that affects society in many significant ways.

Accordingly, for the reasons given above, we find *T.W.* to be clearly erroneous. Based on our established test for assessing stare-decisis issues, we now ask whether there is a valid reason not to recede from *T.W. See State v. Poole*, 297 So. 3d 487, 506-07 (Fla. 2020) (outlining a two-part framework on stare-decisis issues).

We have said that reliance is a critical consideration. *Id.* But as noted by the State, the Supreme Court's reasoning in *Dobbs* shows why reliance does not justify keeping *T.W.* In conducting a

stare-decisis analysis in that case, the Supreme Court stressed that "[t]raditional reliance interests arise 'where advance planning of great precision is most obviously a necessity.'" *Dobbs*, 597 U.S. at 287 (first quoting *Casey*, 505 U.S. at 856 (joint opinion); and then citing *Payne v. Tennessee*, 501 U.S. 808, 828 (1991)). The Court went on to state that "those traditional reliance interests [a]re not implicated because getting an abortion is generally 'unplanned activity,' and 'reproductive planning could take virtually immediate account of any sudden restoration of state authority to ban abortions.'" *Id.* at 288 (quoting *Casey*, 505 U.S. at 856). Finally, the Court rejected application of a more malleable and undefined form of reliance that focused on the relative social and economic effects of abortion. *Id.* at 288-89. In its view, this type of reliance was irrelevant to a proper stare-decisis framework. *Id.*

We think that this analysis from *Dobbs* is in keeping with *Poole*. Indeed, in *Poole*, we expressed wariness for tests that are "malleable and do not lend themselves to objective, consistent, and predictable application." 297 So. 3d at 507 (criticizing *North Florida Women's Health*'s multi-factor stare-decisis framework). And in the years since *Poole* issued, we have not employed the more malleable

form of reliance that *Dobbs* declined to apply—the same sort of societal reliance interests now being advanced by Planned Parenthood.

Apart from arguing reliance, Planned Parenthood does not offer any other valid reasons for keeping *T.W.*  Accordingly, because Planned Parenthood has failed to demonstrate a valid reason for retaining *T.W.*, we recede from it.  We also recede from *Gainesville Woman Care* and *North Florida Women's Health*, which both applied *T.W.*'s flawed reasoning and offered no additional doctrinal justification for locating a right to abortion in the Privacy Clause.

## VII

We now return to the specific facts of this case.  Below, the trial court granted a temporary injunction, finding that Planned Parenthood would likely succeed in its constitutional challenge. Our holding, however, displaces the doctrinal justification for the trial court's decision.  Planned Parenthood cannot demonstrate a likelihood of success on the merits of its claim, which alleged that the newly enacted statute was facially invalid under the Privacy Clause of the Florida Constitution.  And since Planned Parenthood fails on this prong, it is not entitled to a temporary injunction.

Although we do not adopt the reasoning of the First District, we approve the result it reached below.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, and FRANCIS, JJ., concur.
SASSO, J., concurs with an opinion.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

SASSO, J., concurring.

I join the majority opinion because it correctly holds that the Florida Constitution does not contain a right to elective abortion. I write separately to explain why I believe it is appropriate to reach that decision considering the standing arguments raised by the State in the lower court proceedings and on appeal and as highlighted by Amici in this Court. In doing so, I will start with some observations regarding this Court's standing jurisprudence. I will then explain why I agree with the majority's decision to accept the State's waiver of any standing arguments here. Finally, I will explain why I believe, in the proper case, this Court should reconsider its standing precedent.

I.

Standing is the legal doctrine that defines when a litigant has a stake in a controversy sufficient to obtain judicial resolution of that controversy. The doctrine keeps us in our constitutional lane by ensuring we do not become "roving commissions assigned to pass judgment on the validity of the [State's] laws." *See Broadrick v. Oklahoma,* 413 U.S. 601, 611 (1973).

At the federal level, standing requirements are derived from Article III of the United States Constitution's Case or Controversy Clause. Constitutional in origin, standing is therefore a jurisdictional prerequisite to a plaintiff's right to sue in federal court. *See Indus. Servs. Grp., Inc. v. Dobson,* 68 F.4th 155, 167 (4th Cir. 2023) ("It is axiomatic that standing is a threshold jurisdictional issue that must be determined before a court can consider the merits of a case." (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88 (1998))).

For that reason, federal courts have the ability, and indeed the obligation, to address standing *sua sponte* even if a defendant has not raised the issue. *See United States v. Hays,* 515 U.S. 737, 742 (1995) ("[W]e are required to address [standing] even if the courts

- 52 -

below have not passed on it, and even if the parties fail to raise the issue before us." (first alteration in original) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990))); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."). Likewise, the question of standing is not subject to waiver. *Hays*, 515 U.S. at 742.

At the state level, it is different. As it relates to standing, the Florida Constitution is textually distinct from the Federal Constitution because it does not contain an explicit cases and controversies clause. It should go without saying, then, that federal law does not control standing requirements in state courts. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (noting that the constraints of Article III do not apply to state courts, and accordingly state courts are not bound by the limitations of a case or controversy). Even so, this Court has at times reflexively adopted federal standing tests without examining whether the Florida Constitution demands similar requirements. *See, e.g., State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004) (adopting three-part standing

- 53 -

test established by the United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)); *Alterra Healthcare Corp. v. Est. of Shelley*, 827 So. 2d 936, 941 (Fla. 2002) (adopting third-party standing test recognized by the United States Supreme Court).

We have not done so consistently, though. At times, we have concluded that standing in Florida is less restrictive than at the federal level. For example, in *Department of Revenue v. Kuhnlein*, 646 So. 2d 717, 720 (Fla. 1994), we said that the doctrine of standing does not exist in Florida "in the rigid sense employed in the federal system." *See also Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So. 2d 400, 403 (Fla. 1996) (noting that in Florida, unlike the federal system, the doctrine of standing has not been rigidly followed). Consistent with this observation, we have sometimes applied state-specific standing rules. *See, e.g.*, *Johnson v. State*, 78 So. 3d 1305, 1314 (Fla. 2012) (holding a litigant has standing if "he or she reasonably expects to be affected by the outcome of the proceedings, either directly or indirectly" (quoting *Hayes v. Guardianship of Thompson*, 952 So. 2d 498, 505 (Fla. 2006))). Other times we have, either explicitly or implicitly,

bypassed a standing analysis altogether. *See, e.g., J.P.*, 907 So. 2d at 1113 ("Because the Second District never determined whether these juveniles have standing to assert the constitutional rights of their parents, we decline to rule on these claims." (footnote omitted)).[21]

Our inconsistent approach is especially evident in the context of third-party standing. Traditionally, this Court considered as well-settled the rule that one who is not himself denied some constitutional right or privilege cannot be heard to raise constitutional questions on behalf of some other person who may at some future time be affected. *See, e.g., Steele v. Freel*, 25 So. 2d 501, 503 (Fla. 1946). Eventually, though, we carved out exceptions. For example, in *Jones v. State*, 640 So. 2d 1084 (Fla. 1994), we determined that criminal defendants could raise the privacy rights

21. Despite the inconsistent application of various tests to determine whether a party has standing to pursue its claims, our standing precedent has been steady in one respect. We have always held that standing can be waived. *See, e.g., Krivanek v. Take Back Tampa Pol. Comm.*, 625 So. 2d 840, 842 (Fla. 1993); *Cowart v. City of West Palm Beach*, 255 So. 2d 673, 675 (Fla. 1971). However, this is somewhat logically inconsistent, because we oftentimes have adopted federal standards ostensibly derived from the Federal Constitution without adopting the corresponding rule that standing is jurisdictional in nature and therefore not subject to waiver.

of the female minors with whom they had sexual relations because the criminal defendants "st[oo]d to lose from the outcome of this case and yet they ha[d] no other effective avenue for preserving their rights." *Id.* at 1085 (referencing *Stall v. State*, 570 So. 2d 257 (Fla. 1990), for "vicarious standing" requirements).

Later, in *Alterra*, we applied a federal test to determine when parties can sue on behalf of rights belonging to others. 827 So. 2d at 941-42. The test, as laid out in *Alterra*, goes like this: a litigant may bring an action on behalf of a third party if 1) the litigant suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; 2) the litigant has a close relation to the third party; and 3) there is some hindrance to the third party's ability to protect his or her own interests. *Id.* (quoting *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)). But we applied this test in *Alterra* without explicitly adopting it as doctrine and without addressing our previous application of the *Stall* standard in *Jones*.

Only a year after *Alterra* was decided, we again backed away from applying federal standing tests at all in *Allstate Insurance Co. v. Kaklamanos*, 843 So. 2d 885 (Fla. 2003). There, we reiterated

that the doctrine of standing does not exist in Florida "in the rigid sense employed in the federal system." *Id.* at 895 (quoting *Kuhnlein*, 646 So. 2d at 720). This made room for our conclusion that an insured could maintain an action against the insurer for nonpayment of personal injury protection automotive insurance benefits even though the insured had not paid the medical bills in question and the medical provider had not instituted legal action against the insured for nonpayment. *Id.* at 897. And later, we appeared to cabin *Alterra* to the employment context in *Weaver v. Myers*, 229 So. 3d 1118, 1129 (Fla. 2017). In that same case, we also cited favorably the "vicarious standing" test from *Jones*, a case that preceded *Alterra*.[22] *Id.*

---

22. Our doctrinal inconsistency in third-party standing cases is not the only aspect of our standing jurisprudence that has been unclear. For example, as noted above we adopted the three-part standing test established by the United States Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, in *J.P.* But a few years later in *Johnson*, we stated broadly that "standing 'requires a would-be litigant to demonstrate that he or she reasonably expects to be affected by the outcome of the proceedings, either directly or indirectly.'" 78 So. 3d at 1314 (quoting *Hayes*, 952 So. 2d at 505). We did so without any reference to our previous adoption of the *Lujan* test and over the dissenting justices' observation that the moving party would have met that standing requirement. And although we have, with more consistency, adhered to the *Rickman v. Whitehurst*, 74 So. 205 (Fla. 1917), rule when litigants have

II.

With that background in mind, I now return to this case. It serves as a prime example of the challenges our doctrinal inconsistencies create for litigants and lower courts.

In the trial court, the State argued Planned Parenthood lacked standing to challenge HB 5 because none of the plaintiffs could assert a personal right to privacy—instead, the plaintiffs sought to assert the privacy rights of their patients and/or customers. Working off the *Alterra* test, the State then argued Planned Parenthood could not meet the requirements for overcoming the general bar to third-party standing. In doing so, though, the State conceded that the second prong of the *Alterra* test (the close relationship requirement) was satisfied.

In response, Planned Parenthood accepted the State's framing of the issue, arguing it could satisfy the *Alterra* test. This framework carried over to the trial court's order granting the

---

challenged government action, we continue to carve out exceptions without a textual explanation justifying a new exception. *See, e.g.*, *Dep't of Admin. v. Horne*, 269 So. 2d 659 (Fla. 1972) (citing federal precedent to carve out exception for "ordinary citizens and taxpayers" to pursue constitutional claims in certain circumstances even absent a showing of special injury to themselves).

temporary injunction, where it applied the *Alterra* test and concluded that Planned Parenthood has "third-party standing to bring this suit on behalf of their actual and potential patients." *Planned Parenthood of Sw. & Cent. Fla. v. State*, No. 2022-CA-912, 2022 WL 2436704, at *17 (Fla. 2d Cir. Ct. July 5, 2022). But, in the First District, the court concluded that it did not need to address Petitioners' standing argument. Instead, the First District decided that Petitioners had not suffered irreparable harm sufficient to support the issuance of a temporary injunction. *State v. Planned Parenthood of Sw. & Cent. Fla.*, 342 So. 3d 863, 867-68 (Fla. 1st DCA 2022).

That takes us to the parties' briefing filed in this Court. The State reasserted its argument as to Planned Parenthood's standing to pursue its claims. But as the majority opinion notes, the State essentially conceded the issue of standing at oral argument, urging this Court to reach the merits.

So why do we accept that concession? First, as the majority notes, this case has been litigated under the umbrella of this Court's abortion jurisprudence. *See, e.g., Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1253-54 (Fla. 2017); *N. Fla. Women's*

*Health & Counseling Servs., Inc. v. State*, 866 So. 2d 612, 620 (Fla. 2003); *In re T.W.*, 551 So. 2d 1186, 1188-89 (Fla. 1989). And our abortion jurisprudence falls into the category of cases where we have, without explaining why, skipped over a standing analysis altogether. As a result, we have neither directly addressed standing nor applied the *Alterra* test in any of our abortion cases.

Instead, to the extent standing was considered, we seem to have collapsed the analysis into the grounds for obtaining a temporary injunction without considering which standing test to apply or whether an abortion provider can meet that test. *See Gainesville Woman Care*, 210 So. 3d at 1247 ("Petitioners have established a substantial likelihood of success on the merits, one of the requirements of granting a temporary injunction, *as well as all other grounds for the entry of a temporary injunction.*" (emphasis added)). For that reason, addressing standing alone here would have only added to the inconsistencies in our cases.

Second, both parties have asked us to apply the federal third-party standing test as applied in *Alterra*. But as explained above, we have applied that test once. And, for many reasons, I question the wisdom of perpetuating the standard here. For one, I do not

think we should apply federal standards to textually distinct provisions of the Florida Constitution without considering whether that standard is independently justified on state law grounds. For another, reflexively adopting the federal third-party standing test is particularly troublesome because, in federal courts, it has been inconsistently applied and widely criticized. *See, e.g., June Med. Servs. L. L. C. v. Russo,* 140 S. Ct. 2103, 2142-46 (2020) (Thomas, J., dissenting) (noting the test's inconsistent application, criticizing the characterization of third-party standing as prudential in nature, and concluding that third-party standing is inconsistent with the case-or-controversy requirement of Article III).

Finally, and critically, neither party has challenged our characterization of standing as waivable rather than jurisdictional. Similarly, no party has offered an alternative standard to apply in the absence of *Alterra* or an argument as to whether Planned Parenthood fails to meet any alternative standard. As a result, I believe this Court properly reaches the merits of this case.

### III.

While the State's concession takes care of this case, in future cases we should reconsider our standing precedents. Most

fundamentally, we should consider from where our standing requirements are derived (spoiler alert—it is not the Federal Constitution). For example, is standing in Florida derived only from article V's conception of "judicial power"? *See, e.g., Sons of Confederate Veterans v. Henry Cnty. Bd. of Comm'rs*, 880 S.E.2d 168, 185-86 (Ga. 2022) (concluding that standing requirement arises from the Georgia Constitution's judicial power provision). Or does the access to courts provision of article I, section 21 have anything to say as to standing?

Once decided, we will need to clarify the scope of any standing requirements, such as whether parties may assert both legal and factual injuries or whether only a legal injury will suffice. *See, e.g.,* F. Andrew Hessick, *Standing, Injury in Fact, and Private Rights*, 93 Cornell L. Rev. 275, 280-81 (2008) (noting that at common law "factual harm without a legal injury was damnum absque injuria and provided no basis for relief"). We will also need to examine whether standing requirements are truly subject to waiver, or instead whether they are jurisdictional in nature. And finally, we will need to provide a principled methodology to help litigants understand which tests to apply when.

To decide these and other issues related to standing, we will need the benefit of the adversarial process and thorough briefing. For that reason, and in the proper case, I encourage parties to critically assess these and other standing issues and present argument to this Court should the opportunity arise.

LABARGA, J., dissenting.

When the United States Supreme Court's decision in *Dobbs*[23] "returned to the people and their elected representatives" "the authority to regulate abortion," the decision did not force the state of Florida into uncharted territory. Instead, as history reveals and the majority acknowledges, the right to an abortion as a matter of Florida law was decided decades ago following two significant post-*Roe*[24] developments: (1) Florida voters' 1980 approval of an amendment to the Florida Constitution expressly providing a right of privacy, and (2) this Court's 1989 decision in *In re T.W.*, 551 So. 2d 1186 (Fla. 1989), holding that Florida's express right of privacy

---

23. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022).

24. *Roe v. Wade*, 410 U.S. 113 (1973).

encompasses the right to an abortion. Nonetheless, today's majority decision recedes from decades of this Court's precedent and holds that "there is no basis under [Florida's express right of privacy] to invalidate" "a recently amended statute that shortens the window of time in which a physician may perform an abortion." Majority op. at 2. I strongly dissent.

## The Right of Privacy

Adopted by Florida voters in 1980, article I, section 23 of the Florida Constitution provides: "Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law." Contrary to the majority, I am convinced that in 1980, a Florida voter would have understood that the proposed privacy amendment "included broad protections for abortion." *Id.* at 46.

The right of privacy is no novel concept. More than 100 years ago, former Michigan Supreme Court Justice and noted legal scholar Thomas Cooley described "[t]he right to one's person" as the right "to be let alone." Thomas M. Cooley, *A Treatise on the Law of*

*Torts or the Wrongs Which Arise Independent of Contract* 29 (2d ed. 1888). When the right "to be let alone" was discussed by Samuel D. Warren and Louis D. Brandeis in their Harvard Law Review article *The Right to Privacy*, the article primarily discussed the tort of invasion of privacy. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890). However, the authors also made the following salient observation:

> THAT the individual shall have full protection in person and in property is a principle as old as the common law; but it has been found necessary from time to time to define anew the exact nature and extent of such protection. Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society.

*Id.* at 193. Thus, even in early considerations of the right of privacy, scholars recognized that the right would be one that would evolve over time—and it did.

During the twentieth century, political, social, and economic changes led to a host of changes in the legal landscape, resulting in an expansion of the right of privacy far beyond a right to be free from unwanted public exposure. Without question, one of the most significant legal developments was the United States Supreme Court's recognition in *Roe* of an implicit right of privacy

guaranteeing the right to an abortion as a matter of federal law. However, the right of privacy in the context of decisional autonomy took hold several years earlier in *Griswold v. Connecticut*, 381 U.S. 479 (1965) (holding that a state statute prohibiting the use of contraceptives violated the right to marital privacy). It is relevant to the analysis of the public understanding of the right of privacy that *Griswold*'s expansion of privacy to reach decisional autonomy occurred *more than seven years before Roe and fifteen years before Florida voters' adoption of the right of privacy* as a matter of state constitutional law.

The State's argument, that the sole context for Florida's right of privacy is informational privacy, seems to have been a step too far even for the majority. Nonetheless, the majority concludes that the language of "shall not be construed to limit the public's right of access to public records and meetings as provided by law" provides context that "do[es] not lend support to a claim that voters clearly understood abortion to be part and parcel of the rights recognized" under the right of privacy. Majority op. at 23. What is more, it reaches this conclusion despite substantial evidence that

- 66 -

overwhelmingly supports the conclusion that the public understood the right of privacy to encompass the right to an abortion.

## Abortion as a Private Matter

Before turning to the public understanding of the right of privacy, I write to address the majority's suggestion that abortion is ultimately not a private matter because "the procedure itself include[s] medical intervention and require[s] both the presence and intrusion of others." *Id.* at 21 (citing *Roe*, 410 U.S. at 172 (Rehnquist, J., dissenting)).

The majority acknowledges that an abortion "include[s] medical intervention," *see id.*, but beyond merely "includ[ing] medical intervention," Florida's statutes regulating abortion—then and now—*require* that the procedure be performed by a physician. *See* § 390.0111(2), Fla. Stat. (2023) (requiring that a termination of pregnancy be performed by a physician); *Wright v. State*, 351 So. 2d 708 (Fla. 1977) (pre-1980 decision from this Court upholding the conviction of a registered nurse who performed an abortion in violation of statute requiring that the procedure be performed by a physician). The "others" *required* to be present and involved in the procedure are physicians and medical personnel. In the interest of

patient privacy, medical matters, including countless forms of medical procedures, are broadly afforded confidentiality protections with narrowly tailored exceptions.

And notably, the involvement of a physician was not fatal to the privacy issue in *Griswold*, where the United States Supreme Court said: "This law [prohibiting the use of contraceptives], however, operates directly on an intimate relation of husband and wife *and their physician's role in one aspect of that relation*." 381 U.S. at 482 (emphasis added).

As a matter of necessity, physicians and medical personnel are routinely involved in a wide range of medical procedures, decisions, and other medical matters. The majority attempts to limit today's decision to the issue of abortion. *See* majority op. at 10 note 7 ("[T]oday we do not revisit our precedents outside the abortion context."). However, I fear that parties will rely on the majority's reasoning—that the involvement of "others" in an abortion procedure defeats privacy—in attempts to undermine the broad privacy protections that are extended in the medical context.

## The Public Understanding of *Roe v. Wade* and the Right of Privacy

The majority "acknowledge[s] that the public understanding of the term 'privacy' was, to some extent, informed by the United States Supreme Court's 1973 decision in *Roe v. Wade*," observing that "[*f*]*ollowing that decision, the phrase 'right to privacy' gained new connotations that, for the first time, included the choice to have an abortion.*"  Majority op. at 29 (emphasis added).  The majority continues:

> In Planned Parenthood's view, this aspect of federal privacy jurisprudence should control our analysis here. Specifically, Planned Parenthood argues that Florida voters would have internalized *Roe*'s definition of privacy when they voted for the privacy amendment.  *Indeed, Planned Parenthood has repeatedly asserted that the public understanding of this privacy definition was so engrained by 1980 that even without a specific mention of the term abortion, the Privacy Clause unequivocally included such a right by implication.*
> *Though this argument has some force*, we cannot agree with Planned Parenthood that the backdrop of *Roe* conclusively establishes how a voter would have understood the provision.

*Id.* at 29-30 (emphasis added).  The majority concludes that "[c]onsequently, while *Roe* is relevant to our analysis of public meaning, it is not dispositive."  *Id.* at 32.  I could not disagree more.

The majority correctly recognizes the significant impact of *Roe* but stops short of the reality that *Roe*, having fundamentally changed the landscape of abortion rights on a national scale by redefining the scope of the right of privacy, was key to the public understanding of the right of privacy. During the seven-year interval between *Roe* and Florida voters' adoption of the right of privacy, I find it inconceivable that Americans—and more specifically, Floridians—were not aware that the right of privacy encompassed the right to an abortion. I agree with the petitioners that "the public understanding of [*Roe*'s] privacy definition was so engrained by 1980 that even without a specific mention of the term abortion, the Privacy Clause unequivocally included such a right by implication." *Id.* at 29-30.

In fact, the majority notes the controversial impact of *Roe*'s reasoning, which reinforces that the public would have understood the right of privacy encompassed the right to an abortion. *See id.* at 14 (stating that *Roe* "left even progressive legal scholars baffled at how such a right could be gleaned from the constitution's text," and quoting *Dobbs*, 597 U.S. at 268 ("*Roe*'s constitutional analysis was far outside the bounds of any reasonable interpretation of the

various constitutional provisions to which it vaguely pointed.")).

Contrary to the majority's position, evidence of the discussion surrounding *Roe*'s reasoning is probative that the public understood the right of privacy to encompass the right to an abortion, and to so conclude does not require the "analytical leap" that the majority suggests it does. *See id.* at 31. *Roe*'s opponents strenuously disapproved of basing the right to an abortion on the right of privacy; just as strenuously, *Roe*'s supporters agreed with the Supreme Court's analysis. The common denominator is the understanding that the right to an abortion was tied to the right of privacy.

**The Nationwide Understanding of *Roe* and the Right of Privacy**

A decision that triggered pervasive national coverage, *Roe* was publicly discussed and debated in a way that most judicial decisions—even those decided by the United States Supreme Court—are not. Media outlets across the nation reported on the landmark decision.

On the day that *Roe* was decided, Associated Press articles announcing the seminal decision were published on the front pages of newspapers nationwide, many explaining that the decision "was

based predominantly on what [Justice] Blackmun called a right of privacy."[25]  The nightly news programs on the major television networks also reported on *Roe* to an audience of tens of millions of viewers.  The CBS Evening News with Walter Cronkite—a news program with, at that time, a consistent audience of twenty million or more viewers—covered the decision in a segment lasting more than three minutes, noting that "[t]he nine justices made abortion

---

25.  *See, e.g.*, Associated Press, *Abortion Law Out*, Mexico Ledger, Jan. 22, 1973, at 1; Associated Press, Barry Schweid, *Abortion Law Struck by Court*, The Courier News (Blytheville), Jan. 22, 1973, at 1; Associated Press, *Abortions Allowed During 1st 6 Months*, The Daily Chronicle (Centralia), Jan. 22, 1973, at 1; Associated Press, Barry Schweid, *Blackmun Cites 'Right of Privacy' Court Bars Restricting Three-Month Abortions*, The Index-Journal (Greenwood), Jan. 22, 1973, at 1; Associated Press, *Court Strikes Down Abortion Law*, The Neosho Daily News, Jan. 22, 1973, at 1; Associated Press, *Court Strikes Down Abortion Law*, Aiken Standard, Jan. 22, 1973, at 1; Associated Press, *Court Strikes Down Texas Abortion Law*, The Daily Times-News (Burlington), Jan. 22, 1973, at 1; Associated Press, Barry Schweid, *Decision Will Affect 44 States*, Del Rio News-Herald, Jan. 22, 1973, at 1; Associated Press, *High Court Upholds Medical Abortions*, Waukesha Daily Freeman, Jan. 22, 1973, at 1; Associated Press, *Key Abortion Ruling by Supreme Court*, Santa Cruz Sentinel, Jan. 22, 1973, at 1; Associated Press, *Rule on Abortions*, The Sedalia Democrat, Jan. 22, 1973, at 1; Associated Press, *States Can't Block Early Abortions*, The Bismarck Tribune, Jan. 22, 1973, at 1; Associated Press, *Supreme Court Upholds Women's Abortion Rights*, Fairbanks Daily News-Miner, Jan. 22, 1973, at 1; Associated Press, *Texas Law Struck Down, 7-2*, The Vernon Daily Record, Jan. 22, 1973, at 1-2.

largely a private matter." *CBS Evening News with Walter Cronkite*, featuring George Herman in Washington (CBS television broadcast Jan. 22, 1973), https://www.youtube.com/watch?v=dccagy9o5yk (available on the CBS News YouTube channel).

Throughout the nation, local journalists also published articles announcing and explaining *Roe,* as did opinion writers in making their arguments.[26] In some articles, even the titles emphasized that the right to an abortion was based on the right of privacy. *See, e.g., Supreme Court: Right of Privacy Includes Abortion,* The Georgia Bulletin, Feb. 22, 1973, at 2 (calling *Roe* "one of the biggest news stories of the year"); Chicago Daily News Services, *'Privacy' is Reason for Abortion Ruling,* Omaha World-Herald,

---

26. *See, e.g.*, Bonni McKeown, *Abortion's Status in West Virginia: Legal Question Affects Availability*, Beckley Post-Herald, June 21, 1976, at 5 (explaining that *Roe* invalidated most states' abortion laws based on the balancing of the state's interests versus a woman's right of privacy); Washington Post, Editorial, *Abortion: 19th Century*, The Evening Times (Sayre), Feb. 3, 1973, at 4 (same); Joseph Kraft, Opinion, *The High Court Speaks Up for Privacy*, The Greensboro Record, Jan. 29, 1973, at 20 (same); Joseph Kraft, Opinion, *Ruling Revealed Conservative Court*, The Montana Standard, Jan. 28, 1973, at 6 (same); Joseph Kraft, Opinion, *The Abortion Ruling*, The Roanoke Times, Jan. 27, 1973, at 6 (same); Mary Smith, *Abortion Ruling Draws Varied Reactions Here*, The Lawton Constitution, Jan. 23, 1973, at 4 (same).

Jan. 23, 1973, at 18; Associated Press, *'Right of Privacy' Cited in Action Against States*, Reno Gazette-Journal, Jan. 22, 1973, at 1.

*Roe* and its extensive coverage informed legislators and their constituents that the right of privacy under the U.S. Constitution protected the right to an abortion. Far from an issue that faded after one or two news cycles, abortion remained a prevalent issue during the seven years between *Roe* and the 1980 adoption of Florida's privacy amendment. The three-trimester framework laid out in *Roe* balanced the state's interests against the mother's right of privacy, and based on that balancing test, abortion laws in multiple states, including Florida, were struck down on federal privacy grounds. *See Fla. Women's Med. Clinic, Inc. v. Smith*, 478 F. Supp. 233 (S.D. Fla. 1979) (holding unconstitutional, on federal privacy grounds, administrative rules implementing Florida abortion statute); *Jones v. Smith*, 474 F. Supp. 1160 (S.D. Fla. 1979) (granting, on federal privacy grounds, a preliminary injunction against the enforcement of Florida abortion statute); *Coe v. Gerstein*, 376 F. Supp. 695 (S.D. Fla. 1973) (holding Florida abortion statute unconstitutional on federal privacy grounds).

As courts, legislatures, and the public continued to confront the topic of abortion, the media continued to cover *Roe*, noting the historical and legal context: "In the famous 1973 *Roe vs. Wade* case, the U.S. Supreme Court ruled that choosing abortion was part of a woman's right to privacy";[27] "The Supreme Court legalized abortions in 1973, basing its landmark ruling on a woman's right to privacy."[28]

In 1980, only two months before Florida's privacy amendment vote, a United States district court judge struck down North Dakota's new abortion law regulating first trimester abortions, applying *Roe* and stating that "[t]he decision to obtain an abortion free from governmental interference is a fundamental right founded

---

27.  Kevin M. Russell, Letter to the Editor, *Does The Bill Regulating Abortions Deny Women Their Rights?*, The Record (Hackensack), June 17, 1979, at 105.

28.  Associated Press, *Top Court to Decide Abortion Law Rule*, Gettysburg Times, Nov. 28, 1979, at 6; Associated Press, *Abortion Issue Back Before Supreme Court*, The Index-Journal (Greenwood), Nov. 27, 1979, at 8; Associated Press, *Abortion Issue Goes Back to High Court*, News-Journal (Mansfield), Nov. 27, 1979, at 7; Associated Press, *Abortion Issue is Back Before the Supreme Court*, Poughkeepsie Journal, Nov. 27, 1979, at 6; Associated Press, *High Court to Rule on Abortion Issue*, Daily Sitka Sentinel, Nov. 27, 1979, at 2.

in the right of privacy implicit in the Constitution." *Leigh v. Olson*, 497 F. Supp. 1340, 1343 (D.N.D. 1980); Associated Press, *Most of Abortion Law Tossed Out*, The Bismarck Tribune, Sept. 30, 1980, at 1 (front-page newspaper article in North Dakota quoting the court's decision).

Following *Roe*, pro-choice advocates praised the decision for recognizing a woman's right of privacy, while Catholic bishops and other pro-life advocates spoke out against *Roe*, asserting that the decision let the right of privacy outweigh the right to life: "In effect, the Court is saying that the right of privacy takes precedence over the right to life." *U.S. Bishops Issue Message on Abortion*, Panama City News-Herald, Mar. 4, 1973, at 40; *Bishops Reject High Court's Abortion Ruling, Issue Pastoral Applications for Catholics*, The True Voice (Omaha), Feb. 16, 1973, at 1.[29]

---

29. *See also* Katherine Lunine, Letter to the Editor, *Preserve Constitutional Rights*, The Journal News (Hamilton), Feb. 1, 1977, at 4 (showing that pro-choice actors argue that government interference with abortion is limited by a woman's right of privacy); Associated Press, *Abortion Ban Voted by House*, The Corbin Times-Tribune, Sept. 17, 1976, at 12 (same); Associated Press, Betty Anne Williams, *Anti-Abortionists Stage Ban Rally in Washington*, The Robesonian (Lumberton), Jan. 22, 1976, at 2 (same); Associated Press, *'March for Life' Again Seeks Amendment to Ban Abortion*, The Index-Journal (Greenwood), Jan. 22, 1976, at 3 (same); Associated

Ultimately, whether they supported the Supreme Court's decision in *Roe* or not, Americans in 1980 would have understood that the right of privacy encompassed the right to an abortion.

**The Public Understanding of Florida Voters in 1980**

More specifically, and especially relevant to the present case, Florida media coverage after *Roe* illustrates that in 1980 Florida voters would have understood the privacy amendment to encompass the right to an abortion. The wealth of primary sources from Florida strongly indicates what voters would have known.

Newspapers across Florida began reporting on *Roe* the day it was decided: January 22, 1973. In explaining the decision, these articles discussed the federal right of privacy as the basis for the right to an abortion. Adam Richardson, *The Originalist Case for Why the Florida Constitution's Right of Privacy Protects the Right to an Abortion*, 53 Stetson L. Rev. 101, 125 (2023). Like newspapers throughout the nation, Florida newspapers published an Associated

Press, *Washington Rally Marks Abortion Anniversary*, The Times Record (Troy), Jan. 22, 1976, at 3 (same); United Press International, *High Court 7-2 Ruling on Abortion Praised, Condemned*, Traverse City Record-Eagle, Jan. 23, 1973, at 24 (same).

Press article quoting *Roe*'s pronouncement that the right of privacy "is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *See, e.g.*, Associated Press, *Court Strikes Down Abortion Laws*, The Pensacola News, Jan. 22, 1973, at 1; Associated Press, *High Court KOs Ban on Abortion*, Tallahassee Democrat, Jan. 22, 1973, at 1. Coverage of *Roe* and of this broad privacy right also made the front pages of newspapers in Orlando and Fort Myers. *See* Washington Post Dispatch, *High Court Nullifies Abortion Laws*, Sentinel Star (Orlando), Jan. 23, 1973, at 1; Associated Press, *Six-Month Abortions Upheld*, Fort Myers News-Press, Jan. 23, 1973, at 1.

In 1980, the right of privacy and its inextricable connection to the right to an abortion continued to permeate Florida news. When Justice Douglas died in January 1980, Florida newspapers reported his legacy with mention of his majority opinion in *Griswold* as a precursor to *Roe*. Richardson, *supra*, at 131; James W. Fox Jr., *A Historical and Originalist Defense of Abortion in Florida*, 75 Rutgers U. L. Rev. 393, 427-28 (2023). For example, a *Miami Herald* article noted that after *Griswold*, "the [United States Supreme] court moved to rule, in 1973, that a woman in early pregnancy has a

constitutional right of privacy to choose abortion without government interference." Aaron Epstein, *William O. Douglas: Champion of Underdogs, Unpopular Ideas*, The Miami Herald, Jan. 27, 1980, at 5-E.

Florida news coverage of the United States Supreme Court continued with reports of abortion cases—and their right of privacy issues. In discussing the Supreme Court's 1980 oral arguments in *H. L. v. Matheson*, 450 U.S. 398 (1981), which involved parental notification of abortion, the *Miami Herald* reported that "[o]ut of this conflict between a minor's right to privacy and her parents' obligation to care for her has emerged a constitutional issue that was accepted Monday for review by the U.S. Supreme Court." Aaron Epstein, *Court Will Examine Parents' Notification for Minor's Abortion*, The Miami Herald, Feb. 26, 1980, at 10-A. And explaining the Court's decision in *Harris v. McRae*, 448 U.S. 297 (1980), which upheld the Hyde Amendment's restrictions on the use of federal funds to pay for an abortion, the *Pensacola News* reported that the decision "had nothing to do with the legality of abortion itself" because "[t]he Supreme Court legalized abortion in its landmark 1973 decision" in which "the court said a woman's right to privacy

makes her decision to have an abortion a matter only for her and her doctor during the first three months of her pregnancy." Associated Press, *High Court Rules on Abortions*, The Pensacola News, June 30, 1980, at 1.

Florida newspapers covered major party platforms, including their stances on abortion. These articles linked the abortion issue with the right of privacy. The *Fort Lauderdale News* and other Florida newspapers published a syndicated column indicating that although the Republican platform did not yet have a consensus on abortion, the Supreme Court had made its determination in 1973 by, in the author's view, "forging from a 'privacy right' a scythe to mow down state laws that expressed various community judgments about abortion." *See* George Will, Opinion, *Bridges to Cross; Bridges to Burn*, Fort Lauderdale News, July 17, 1980, at 18A; Richardson, *supra*, at 132 n.177 (observing that the column ran in *Florida Today*, *Fort Myers News-Press*, *Palm Beach Post*, *Pensacola News*, *Sentinel Star* (Orlando), *St. Lucie News Tribune*, *St. Petersburg Times*, *Stuart News*, and *Tallahassee Democrat*). Covering the Democratic platform, the *St. Petersburg Times* reported that delegates had voted for a platform statement opposing "government

interference in the reproductive decisions of Americans" and "restrictions on funding for health services for the poor that deny poor women especially the right to exercise a constitutionally-guaranteed right to privacy." Charles Stafford, *Kennedy Stirs Democrats with Rousing Call to Arms*, St. Petersburg Times, Aug. 13, 1980, at 1-A (quoting the statement under the label "ABORTION").

Florida newspapers also covered statements by pro-choice activists and by pro-life activists that demonstrate both groups' understanding of abortion as part of the right of privacy. *See* Associated Press, *Planned Parenthood Waving the Flag*, The Tampa Tribune, Oct. 4, 1980, at 7-D ("In recent years we have faced an increasingly vocal and at times violent minority which seeks to deny all of us our fundamental rights of privacy and individual decision-making."); Carol Jeffares, *Her Love of Life Makes Her Stand, Fight for It*, The Tampa Tribune, Sept. 20, 1980, at 5-Pasco ("The abortion law is based on the woman's right to privacy. It says 'a woman's right to privacy supersedes the fetus's life.' "); Richardson, *supra*, at 132. With inflammatory language, both pro-choice and pro-life letters to the editor in Florida newspapers further demonstrate this understanding. *See* Joyce Tarnow, Letter to the Editor, *Vote Out*

*Anti-Abortionists*, Fort Lauderdale News, Jan. 29, 1980, at 26-A ("The U.S. Constitution guarantees each of us the right of privacy, the right of religious freedom and the right to pursue happiness however we define it. Compulsory pregnancy is a denial of each of these rights."); Hugh Pope, Letter to the Editor, The Tampa Tribune-Times, Nov. 2, 1980, at 2-C ("There cannot be a more compelling reason for intelligent and patriotic Americans to vote Republican than to save lives! Stripped of all its sugarcoated slogans—'freedom of choice[,]' [] 'woman's right to privacy[,]' [] etc., etc., abortion is legalized murder.").

The foregoing primary sources from Florida and from across the United States are examples of many. These sources should not be overlooked, and their impact should not be undervalued. In a quest to uncover the original public meaning of the Florida Constitution's Privacy Clause, they reveal that *Roe* was widely known for its holding and for its reasoning. Thus, in 1980, Florida voters would have understood the right of privacy as encompassing the right to an abortion.

I hasten to add that the coverage discussed above, specifically connecting *Roe* and the right to an abortion to the right of privacy,

occurred at a time when Americans relied heavily on print media and national news broadcasts.

### **Florida Courts Acknowledge Right of Privacy Under *Roe***

By the time Florida voters adopted the privacy amendment in 1980, Florida court decisions had repeatedly acknowledged the right of privacy expanded under federal law by *Roe.*  While these decisions did not conclude that a right of privacy existed on state law grounds, they do provide further support that the public would have understood the link between the right to an abortion and the right of privacy.

In 1977, this Court stated that "Justice Blackmun's articulation in *Roe v. Wade* of the limited scope of the right to privacy *remains the current state of the law.*"  *Laird v. State*, 342 So. 2d 962, 965 (Fla. 1977) (emphasis added) (rejecting argument that a right of privacy protected the possession of marijuana in the home). Even the dissenting opinion in *Laird* observed: "A constitutional right to privacy *has been clearly established by the United States Supreme Court in . . . Roe . . . .*"  *Id.* at 966 (Adkins, J., dissenting) (emphasis added).

In *Jones v. Smith*, 278 So. 2d 339 (Fla. 4th DCA 1973), *cert. denied, Jones v. Smith*, 415 U.S. 958 (1974), a case involving the abortion context, the Fourth District Court of Appeal rejected the claim of a putative father that he was entitled to prevent the mother from obtaining an abortion. The district court rejected that argument, saying:

> The recent decisions of the United States Supreme Court in *Roe v. Wade . . .* and *Doe v. Bolton* [410 U.S. 179 (1973)], while dealing with the constitutionality of statutes, set forth what we perceive to be the essential and underlying factor in the determination of this appeal. *That factor is the "right of privacy" of the mother.*

*Id.* at 341 (emphasis added). Additionally, in discussing the right of privacy, the district court noted an observation made by the United States Supreme Court in *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251 (1891): "As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity to be let alone.' " 278 So. 2d at 342 (quoting *Babbitz v. McCann*, 310 F. Supp. 293, 299 (E.D. Wisc. 1970)).

Moreover, in *Wright*, the statute at issue required that an abortion be performed by a physician and at an approved facility. The petitioner, a registered nurse, challenged the approved facility

requirement on the basis that under *Roe* and other federal decisions, the requirement violated the right of privacy. 351 So. 2d at 710. This Court ultimately upheld the petitioner's conviction on the ground that the statute constitutionally prohibited non-physicians from performing an abortion. Despite concluding that the approved facility requirement was unconstitutional, this Court rejected the petitioner's privacy argument, stating: "The right to privacy in the abortion decision, recognized in *Roe* . . . as belonging to the pregnant woman in consultation with her physician, gives way to state power to regulate as the embryo or fetus develops." *Id.* at 710.[30]

---

30. Other decisions not involving abortion-related issues also recognized the right of privacy established in *Roe*. *See, e.g.*, *Rodriguez v. State*, 378 So. 2d 7, 8 n.2 (Fla. 2d DCA 1979) ("In *Roe*, the court balanced the fundamental right to privacy of a woman's decision whether or not to terminate pregnancy against state interest to limit that right to safeguard health and potential life."); *Franklin v. White Egret Condo., Inc.*, 358 So. 2d 1084, 1089 (Fla. 4th DCA 1977) (observing on motion for rehearing that "[t]he right to be free of unwarranted interference with the decision to have children has been identified on numerous occasions by the United States Supreme Court as one of the matters protected by the right of privacy"); *Day v. Nationwide Mut. Ins. Co.*, 328 So. 2d 560, 562 (Fla. 2d DCA 1976) ("The decision to have an abortion during the first trimester has been held to be private and personal to the individual woman. The primary interest, at least in the early stages of pregnancy, is that of the woman and her right to privacy." (citations

### *Roe* and the Privacy Amendment Debate

According to the majority, the relative absence of the topic of

abortion from the debate over Florida's proposed privacy

amendment is evidence that the public did not understand that the

right to an abortion was included in the scope of the proposed right

of privacy. *See* majority op. at 41-42 (citing Fox, *supra*, at 443-44).

However, Professor Fox explains why the topic of abortion was not a

part of the amendment debate:

> Abortion would only have been debated if its coverage
> within the right to privacy were in dispute or were not yet
> established in law. But as of 1980 the protection of
> abortion through the right to privacy was the established
> law. It would hardly make sense for debates about
> section 23 to invest time and effort re-arguing the
> reasoning of *Roe*, let alone arguing that the terms "right
> to privacy," "right to be let alone," and "free from
> governmental intrusion" would plainly mean what they
> already meant in federal law.

Fox, *supra*, at 442-43 (emphasis omitted). Indeed, *Roe*'s extension

of the right of privacy to the abortion context so dominated the

abortion discussion that it would have been well understood that

---

omitted)). Again, these cases are relevant to demonstrate that after
*Roe*, and before voters adopted Florida's privacy amendment, the
right to an abortion as a matter of a right of privacy would have
been well understood.

the right of privacy adopted by Florida voters included the right to an abortion.

### In re T.W.

> [S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491 (1977). Indeed, "[t]he citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23 of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy." *Winfield v. Div. of Pari-Mutuel Wagering*, 477 So. 2d 544, 548 (Fla. 1985). The amendment "was intentionally phrased in strong terms . . . in order to make the privacy right as strong as possible." *Id.*

It was in the context of Florida's broad right of privacy that almost thirty-five years ago, this Court held as a matter of state

constitutional law that "Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy." *T.W.*, 551 So. 2d at 1192. *T.W.* explained: "[W]e have said that the [privacy] amendment provides 'an explicit textual foundation for those privacy interests inherent in the concept of liberty which may not otherwise be protected by specific constitutional provisions.' " *Id.* (quoting *Rasmussen v. S. Fla. Blood Serv.*, 500 So. 2d 533, 536 (Fla. 1987)).

Unfortunately, the majority's decision to recede from *T.W.* and its progeny constitutes the rejection of a "decades-long line of cases hold[ing] that the Privacy Clause 'embraces more privacy interests, and extends more protection to the individual in those interests, than [does] the federal Constitution.' " Petitioners' Opening Brief at 41 (emphases omitted) (quoting *T.W.*, 551 So. 2d at 1192). The decision is an affront to this state's tradition of embracing a broad scope of the right of privacy.[31]

---

31. In 2012, Florida reaffirmed this tradition when voters rejected a state constitutional amendment that would have narrowed protections for abortion rights in Florida by requiring that the protections be no greater than those provided under federal law. Additionally, the amendment would have overruled *T.W.* and other decisions concluding that Florida protections for abortion rights

In deciding to reexamine *T.W.* and ultimately to recede from *T.W.* and its progeny, the majority states: "Since *Roe* featured prominently in *T.W.*, we think it fair to also point out that the *T.W.* majority did not examine or offer a reasoned response to the existing criticism of that decision or consider whether it was doctrinally coherent.  This was a significant misstep because *Roe* did not provide a settled definition of privacy rights."  Majority op. at 13-14.  I disagree.

*T.W.* did acknowledge that "the workability of the trimester system and the soundness of *Roe* itself have been seriously questioned in *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989)."  *T.W.*, 551 So. 2d at 1190.  However, this Court correctly

---

exceed those provided under federal law.  In a decisive vote, more than fifty-five percent of Florida voters rejected the amendment. *See Initiative Information: Prohibition on Public Funding of Abortions; Construction of Abortion Rights*, Fla. Dep't of State, Division of Elections, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=10&seqnum=82 (last visited Mar. 19, 2024).

While the petitioners conceded during the oral argument in this case that Florida voters' rejection of the abortion amendment in 2012 was not relevant to the public understanding of the right of privacy adopted in 1980, the 2012 amendment rejection is still relevant to an understanding of Florida's tradition with respect to the right of privacy.

observed that "[*Roe*] for now remains the federal law." *See id.* As such, this Court was not obligated in *T.W.* to "examine or offer a reasoned response to the existing criticism of [*Roe*] or consider whether it was doctrinally coherent." Majority op. at 13-14. It was "*three years after T.W.*" and almost twelve years after Florida voters' 1980 adoption of the right of privacy that "the U.S. Supreme Court abandoned *Roe*'s position that the right to abortion was grounded in any sort of [federal] privacy right." *See id.* at 15 (emphasis added) (citing *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 846 (1992)). Even then, the United States Supreme Court did not abandon *Roe*'s "essential holding." *Casey*, 505 U.S. at 846.

I reemphasize that *T.W.* was decided on state law grounds and with a clear understanding of the breadth of Florida's right of privacy as discussed in *Winfield*. To be certain, *Roe* was fundamental to the public understanding of the right of privacy as encompassing the right to an abortion. However, *T.W.* did not rely on *Roe* or the federal constitution to determine that Florida's right of privacy included the right to an abortion. *See T.W.*, 551 So. 2d at 1196 ("We expressly decide this case on state law grounds and cite federal precedent only to the extent that it illuminates Florida

law."). Because this Court based its decision squarely on Florida law, there is no basis for upending decades of precedent that give effect to Florida's broad right of privacy.

**Beyond Today's Decision**

The impact of today's decision extends far beyond the fifteen-week ban at issue in this case. By operation of state statute, the majority's decision will result in even more stringent abortion restrictions in this state. While not before this Court in the present case, it is an irrefutable effect of today's decision that chapter 2023-21, Laws of Florida, also known as the Heartbeat Protection Act, will take effect in short order. Chapter 2023-21 amends section 390.0111, Florida Statutes (among other statutes), and with limited exceptions, it bans abortions beyond the gestational age of six weeks.

The Act provides that the ban will take effect thirty days after any of the following events: (1) *a decision by this Court holding that Florida's constitutional right to privacy does not include a right to abortion*; (2) *a decision by this Court in the present case allowing the fifteen-week ban to remain in effect*; (3) an amendment to the Florida Constitution clarifying that Florida's constitutional right of privacy

does not include the right to an abortion; or (4) *a decision from this Court after March 7, 2023, that recedes in whole or part from any of the following: T.W.*, *North Florida Women's Health v. State*, 866 So. 2d 612 (Fla. 2003), and *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243 (Fla. 2017). *See* ch. 2023-21, § 9, Laws of Fla. Today's decision implicates three of these four events, meaning that the Act's six-week ban will take effect in thirty days.

## Conclusion

"The document that the [majority] releases [today] is in the form of a judicial opinion interpreting a [provision of the Florida Constitution] . . . ." *Bostock v. Clayton Co.*, 590 U.S. 644, 683 (2020) (Alito, J., dissenting). However, I lament that what the majority has done today supplants Florida voters' understanding—then and now—that the right of privacy includes the right to an abortion.

The majority concludes that the public understanding of the right of privacy did not encompass the right to an abortion. However, the dominance of *Roe* in the public discourse makes it inconceivable that in 1980, Florida voters did not associate abortion with the right of privacy.

Because of this, and with deep dismay at the action the majority takes today, I dissent.

Application for Review of the Decision of the District Court of Appeal Direct Conflict of Decisions

First District - Case No. 1D22-2034

(Leon County)

Whitney Leigh White, Jennifer Dalven, and Johanna Zacarias of American Civil Liberties Union Foundation, New York, New York,

for Petitioners Gainesville Woman Care, LLC, Indian Rocks Woman's Center, Inc., St. Petersburg Woman's Health Center, Inc., and Tampa Woman's Health Center, Inc.,

Autumn Katz and Caroline Sacerdote of Center for Reproductive Rights, New York, New York,

for Petitioner A Woman's Choice of Jacksonville, Inc.

Jennifer Sandman of Planned Parenthood Federation of America, New York, New York,

for Petitioners Planned Parenthood of Southwest and Central Florida, Planned Parenthood of South, East, and North Florida, and Shelly Hsiao-Ying Tien, M.D., M.P.H.

April A. Otterberg and Shoba Pillay of Jenner & Block LLP, Chicago, Illinois; and Daniel Tilley of American Civil Liberties Union Foundation of Florida, Miami, Florida; Benjamin James Stevenson, American Civil Liberties Union Foundation of Florida, Pensacola, Florida, and Nicholas L.V. Warren of American Civil Liberties Union Foundation of Florida, Inc., Tallahassee, Florida,

for Petitioners

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, Daniel William Bell, Chief Deputy Solicitor General, Nathan A. Forrester, Senior Deputy Solicitor General, David M. Costello, Deputy Solicitor General, Darrick W. Monson, Assistant Solicitor General, Zachary Grouev, Solicitor General Fellow, John M. Guard, Chief Deputy Attorney General, James H. Percival, Chief of Staff, and Natalie P. Christmas, Assistant Attorney General, Office of the Attorney General Tallahassee, Florida,

for Respondent

Brad F. Barrios of Turkel Cuva Barrios, P.A., Tampa, Florida,

for Amici Curiae Law Professors

Jonathan B. Miller and Hilary Burke Chan of Public Rights Project, Oakland, California; and Matthew A. Goldberger of Matthew A. Goldberger, P.A., West Palm Beach, Florida,

for Amici Curiae Current and Former Elected Representatives for Reproductive Justice

Kimberly A. Parker, Lesley F. McColl, and Aleksandr Sverdlik of Wilmer Cutler Pickering Hale and Dorr LLP, Washington, District of Columbia, and Meghan G. Wingert of Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; and Sean Shaw of Swope Rodante, Tampa, Florida,

for Amici Curiae American College of Obstetricians and Gynecologists, American Medical Association, and Society for Maternal-Fetal Medicine

Miranda Schiller, Sarah M. Sternlieb, Robert Niles-Weed, and Elizabeth McLean of Weil, Gotshal & Manges LLP, New York, New York, Charlotte McFaddin and Caroline Elvig of Weil, Gotshal & Manges LLP, Washington, District of Columbia, and Edward Soto of Weil, Gotshal & Manges LLP, Miami, Florida,

for Amicus Curiae Floridians for Reproductive Freedom

Angela C. Vigil, Robert H. Moore, and Paul Chander of Baker & McKenzie LLP, Miami, Florida; and Francisca D. Fajana of LatinoJustice PRLDEF, New York, New York, and Emily M. Galindo of LatinoJustice PRLDEF, Orlando, Florida,

> for Amici Curiae LatinoJustice PRLDEF, Florida Access Network, National Latina Institute for Reproductive Justice, Esperanza United, and A.L.

Brian J. Stack and Robert Harris of Stack Fernandez & Harris, P.A., Miami, Florida; and Sarah B. Gutman, Lilianna Rembar, and Caroline Soussloff of Cleary Gottlieb Steen & Hamilton, New York, New York, and Jennifer Kennedy Park of Cleary Gottlieb Steen & Hamilton, San Francisco, California,

> for Amici Curiae Sanctuary for Families, Legal Momentum, The National Organization for Women Foundation, The Rapid Benefits Group Fund, Women for Abortion and Reproductive Rights, Margaret A. Baldwin, JD, Professor Cyra Choudhury, Professor Donna K. Coker, Professor Zanita E. Fenton, Doctor Kathryn M. Nowotny, PhD, and Jodi Russell

Eugene M. Gelernter and Caitlin A. Ross of Patterson Belknap Webb & Tyler LLP, New York, New York; and Courtney Brewer of The Mills Firm, P.A., Tallahassee, Florida,

> for Amici Curiae National Council of Jewish Women, Religious Coalition for Reproductive Choice, Catholics for Choice, Metropolitan Community Churches, National Council of Jewish Women - Greater Miami Section, National Council of Jewish Women - Palm Beach Section, National Council of Jewish Women - Sarasota Manatee Section, National Council of Jewish Women - Kendall Section, National Council of Jewish Women - Valencia Shores Section, Reconstructionist Rabbinical Association, Women's Rabbinic Network, Moving Traditions, Avodah, Bend the Arc: A Jewish Partnership for Justice, Jewish Council for Public Affairs, Jewish Orthodox

Feminist Alliance, Union for Reform Judaism, Central Conference of American Rabbis, Men of Reform Judaism, Women of Reform Judaism, Rabbinical Assembly, Society for Humanistic Judaism, Muslim Women's Organization, Hindus for Human Rights, Sadhana: Coalition of Progressive Hindus, Women's Alliance for Theology, Ethics, and Ritual (WATER), SACReD (Spiritual Alliance of Communities for Reproductive Dignity), Faith in Public Life, and Florida Interfaith Coalition for Reproductive Health and Justice

Jordan E. Pratt and Christine K. Pratt of First Liberty Institute, Washington, District of Columbia,

>for Amicus Curiae National Institute of Family and Life Advocates

Alan Lawson, Paul C. Huck, Jr., Jason Gonzalez, Amber Stoner Nunnally, and Caroline May Poor of Lawson Huck Gonzalez, PLLC, Tallahassee, Florida,

>for Amicus Curiae Former State Representative John Grant

Christopher Green, University, Mississippi; and Antony B. Kolenc, Naples, Florida,

>for Amici Curiae Scholars on original meaning in State Constitutional Law

Lynn Fitch, Attorney General, Scott G. Stewart, Solicitor General, and Justin L. Matheny, Deputy Solicitor General, Mississippi Attorney General's Office, Jackson, Mississippi; and Samuel J. Salario, Jr. of Lawson Huck Gonzalez, PLLC, Tampa, Florida,

>for Amici Curiae Mississippi, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Texas, Utah, and West Virginia

Stephen C. Emmanuel of Ausley McMullen, Tallahassee, Florida,

for Amici Curiae Florida Conference of Catholic Bishops and the Florida Baptist Convention

Jay Alan Sekulow, Jordan Sekulow, and Olivia F. Summers of American Center for Law & Justice, Washington, District of Columbia; and Edward L. White III of American Center for Law & Justice, Ann Arbor, Michigan,

for Amicus Curiae Charlotte Lozier Institute

Christopher E. Mills of Spero Law LLC, Charleston, South Carolina; and Chad Mizelle, Tampa, Florida,

for Amicus Curiae American College of Pediatricians

Edward M. Wenger of Holtzman Vogel Baran Torchinsky & Josefiak, PLLC, Washington, District of Columbia,

for Amicus Curiae American Cornerstone Institute

Carlos A. Rey, General Counsel, Kyle E. Gray, Deputy General Counsel, The Florida Senate, David Axelman, General Counsel, and J. Michael Maida, Deputy General Counsel, The Florida House of Representatives, Tallahassee, Florida,

for Amicus Curiae The Florida Legislature

Kenneth L. Connor of Connor & Connor, LLC, Aiken, South Carolina,

for Amicus Curiae Liberty Counsel Action

S. Dresden Brunner of S. Dresden Brunner, P.A., Naples, Florida,

for Amicus Curiae The Prolife Center at the University of St. Thomas (MN)

Patrick Leduc of Law Offices of Patrick Leduc, P.A., Tampa, Florida,

    for Amicus Curiae American Association of Pro-Life Obstetricians and Gynecologists

Mathew D. Staver, Anita L. Staver, Horatio G. Mihet, and Hugh C. Phillips of Liberty Counsel, Orlando, Florida,

    for Amici Curiae Frederick Douglass Foundation, The National Hispanic Christian Leadership Conference, Fiona Jackson Center for Pregnancy, and Issues4life Foundation

D. Kent Safriet of Holtzman Vogel Baran Torchinsky & Josefiak, PLLC, Tallahassee, Florida,

    for Amicus Curiae Susan B. Anthony Pro-Life America

Denise M. Harle of Alliance Defending Freedom, Lawrenceville, Georgia, and Joshua L. Rogers of Alliance Defending Freedom, Scottsdale, Arizona,

    for Amicus Curiae Concerned Women for America